[No. S053938. May 12, 1997.]

JAMES WILLIAM WRIGHT, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

522

### COUNSEL

Ronald Y. Butler, Public Defender, Carl C. Holmes, Assistant Public Defender, Denise M. Gragg, Thomas Havlena and Alan J. Crivaro, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Michael R. Capizzi, District Attorney, Maurice L. Evans, Chief Assistant District Attorney, and Donald L. Clarence, Deputy District Attorney, for Real Party in Interest.

### OPINION

**BROWN, J.**—When a registered sex offender changes his or her residence address, the offender must notify the law enforcement agency of last registration within a specified period. (Pen. Code, § 290, subd. (f); further undesignated statutory references are to the Penal Code.) Prior to January 1,

1995, failure to provide such notification was a misdemeanor; thereafter, the Legislature declared it a felony. (Stats. 1994, ch. 867, § 2.7.) The question before us is whether felony prosecution is prohibited as ex post facto if the defendant's address change and failure to notify occurred when the violation was classified as a misdemeanor. The answer turns on whether the Legislature intended section 290, subdivision (f), to describe a continuing affirmative duty. Considering the overall statutory scheme and purpose of section 290, we find the failure to comply with interim registration requirements is a continuing offense and therefore conclude felony prosecution is not ex post facto.

## FACTUAL AND PROCEDURAL BACKGROUND

By an amended two-count information filed September 11, 1995, the People charged petitioner James William Wright (defendant) with felony violation of section 290, subdivisions (a) and (f). The information alleged the offenses occurred between February 1 and March 23, 1995, based on the following facts adduced at the preliminary hearing:

On March 23, 1995, Anthony Valente, a special agent with the California Department of Justice, went to defendant's last known address on Los Angeles Way in Buena Park. At that location, Valente encountered Henry Longbreak, who said defendant had moved out some time in November 1994. Although Longbreak claimed he did not know defendant's whereabouts, he suggested Valente check an apartment on South Knott Avenue in Anaheim. Valente located defendant at that address and placed him under arrest for violation of parole; an open suitcase containing his belongings was found on the living room floor. According to Steve Cedarquist, who lived in the apartment with his girlfriend, defendant was not a resident but only took an occasional shower there.

Marjorie Martin, a records supervisor with the Buena Park Police Department, testified defendant had registered with the department as a sex offender on August 15, 1994. He never informed the department he had left the Los Angeles Way address.

Defendant moved to dismiss the information pursuant to section 995, contending felony prosecution violated the ex post facto proscription because the charges were misdemeanors when he failed to report his change of address in November 1994. On motion of the People, the trial court dismissed count 1 (§ 290, subd. (a)) for insufficient evidence. As to count 2 (§ 290, subd. (f)), the court concluded it was a continuing offense and thus properly prosecuted as a felony.

On defendant's petition, the Court of Appeal issued a writ of mandate directing the trial court to dismiss the information in its entirety. Over a dissenting view, the court determined violation of section 290, subdivision (f), is an instantaneous offense completed as soon as the notification grace period expires. In defendant's case, that occurred sometime in December 1994; therefore, he could only be prosecuted for a misdemeanor violation. We granted the People's petition for review and now reverse.

DISCUSSION

■ Does section 290, subdivision (f) (section 290(f)), describe an instantaneous or a continuing offense? Most crimes are instantaneous since they are committed as soon as every element is satisfied. Some crimes, however, are not terminated by a single act or circumstance but are committed as long as the proscribed conduct continues. Each day brings "a renewal of the original crime or the repeated commission of new offenses." (*Toussie* v. *United States* (1970) 397 U.S. 112, 119 [90 S.Ct. 858, 862, 25 L.Ed.2d 156] (*Toussie*).) The distinction is critical because it determines the application of many legal principles such as the statute of limitations period, venue, jurisdiction, sentencing, double jeopardy, and, as here, the prohibition against ex post facto laws.

■ The concept of a continuing offense is well established.[1] For present purposes, it may be formulated in the following terms: "Ordinarily, a continuing offense is marked by a continuing duty in the defendant to do an act which he fails to do. The offense continues as long as the duty persists, and there is a failure to perform that duty." (*Duncan* v. *State* (1978) 282 Md.

---

[1]See, e.g., *People* v. *Bland* (1995) 10 Cal.4th 991, 999 [43 Cal.Rptr.2d 77, 898 P.2d 391] (drug possession); *People* v. *Warren* (1940) 16 Cal.2d 103, 112 [104 P.2d 1024] (carrying concealed weapon); *People* v. *Bradford* (1995) 38 Cal.App.4th 1733, 1738-1739 [45 Cal.Rptr.2d 757] (cultivation of marijuana); *People* v. *Keehley* (1987) 193 Cal.App.3d 1381, 1385 [239 Cal.Rptr. 5] (unauthorized possession of food stamps); *In re Parks* (1986) 184 Cal.App.3d 476, 480 [229 Cal.Rptr. 202] (failure to register as a sex offender); *Williams* v. *Superior Court* (1978) 81 Cal.App.3d 330, 343-344 [146 Cal.Rptr. 311] (concealing stolen property); *People* v. *Lewis* (1978) 77 Cal.App.3d 455, 460-461 [143 Cal.Rptr. 587, 3 A.L.R.4th 1185] (pimping); *Martin* v. *Superior Court* (1962) 199 Cal.App.2d 730, 737 [18 Cal.Rptr. 773] (contempt of court for failure to pay child support); *People* v. *Nelson* (1940) 42 Cal.App.2d 83, 86 [108 P.2d 51] (failure to provide for minor children); *People* v. *Knight* (1939) 35 Cal.App.2d 472, 474-475 [96 P.2d 173] (driving while intoxicated); *People* v. *Arnest* (1933) 133 Cal.App. 114, 121 [23 P.2d 812] (theft committed on railroad train prosecuting its trip); *In re Tom Wong* (1932) 122 Cal.App. 672, 674 [10 P.2d 797] (vagrancy); *People* v. *Jones* (1926) 78 Cal.App. 554, 557 [248 P. 964] (maintaining a nuisance); *In re Wenman* (1917) 33 Cal.App. 592, 593 [165 P. 1024] (kidnapping); see also *Toussie, supra,* 397 U.S. at pages 134-135 [90 S.Ct. at pages 870-871] (dis. opn. of White, J.); *People* v. *Griffiths* (1978) 67 Ill.App.3d 16, 20 [23 Ill.Dec. 734, 384 N.E.2d 528, 530-531]; *John* v. *State* (1980) 96 Wis.2d 183, 189 [291 N.W.2d 502, 505].

385, 390 [384 A.2d 456, 459]; *John* v. *State, supra,* 96 Wis.2d at p. 188 [291 N.W.2d at p. 505].) Thus, when the law imposes an affirmative obligation to act, the violation is *complete* at the first instance the elements are met. It is nevertheless not *completed* as long as the obligation remains unfulfilled. "The crime achieves no finality until such time." (*United States* v. *Cores* (1958) 356 U.S. 405, 409 [78 S.Ct. 875, 878, 2 L.Ed.2d 873]; see *State* v. *Morse* (1969) 54 N.J. 32, 35 [252 A.2d 723, 725] ["Although a violation . . . comes into being at the expiration of the [grace] period, there is nonetheless a continuing requirement that a person within the reach of the statute shall meet its terms."]; see also *Williams* v. *Superior Court, supra,* 81 Cal.App.3d at pp. 343-344.)

Determining if a particular violation of law constitutes a continuing offense is primarily a question of statutory interpretation. (*Toussie, supra,* 397 U.S. at p. 115 [90 S.Ct. at p. 860]; see, e.g., *People* v. *Keehley, supra,* 193 Cal.App.3d at p. 1385; see *Williams* v. *Superior Court, supra,* 81 Cal.App.3d at p. 344.) The answer, however, does not depend solely on the express language of the statute. Equally important is whether "the nature of the crime involved is such that [the Legislature] must assuredly have intended that it be treated as a continuing one." (*Toussie, supra,* at p. 115 [90 S.Ct. at p. 860]; see *United States* v. *Cores, supra,* 356 U.S. at pp. 409-410 [78 S.Ct. at pp. 878-879].) Accordingly, we must consider both the text of section 290(f) and its statutory context.

In November 1994, section 290(f) provided: "If any person required to register pursuant to this section changes his or her residence address, the person shall inform, in writing within 10 days, the law enforcement agency or agencies with whom he or she last registered of the new address. The law enforcement agency or agencies shall, within three days after receipt of this information, forward it to the Department of Justice. The Department of Justice shall forward appropriate registration data to the law enforcement agency or agencies having local jurisdiction of the new place of residence."[2] The provision is part of a comprehensive scheme enacted in 1947 requiring certain convicted sex offenders to register with appropriate law enforcement agencies; it assumed substantially its present form in 1950. (Stats. 1950, First Ex. Sess. 1949, ch. 13, § 1, p. 27.)

By its terms, section 290(f) does not expressly state a continuing offense. The obligation is, however, described as an affirmative, mandatory duty.

---

[2]The grace period is now "five working days" and registrants must notify of any name changes. (Stats. 1996, ch. 909, § 2.) Effective January 1, 1995, the Legislature revised the numbering of certain subdivisions. (See Stats. 1994, ch. 867, § 2.7.) Unless otherwise indicated, statutory references are to provisions as they read in 1994.

Moreover, nothing in the statute indicates the mere passage of time will extinguish the notification requirement. (See *In re Parks, supra,* 184 Cal.App.3d at p. 480.) Nevertheless, the language is too uncertain to support a finding solely on that basis. (*Toussie, supra,* 397 U.S. at p. 115 [90 S.Ct. at p. 860].) We must therefore consult the broader statutory scheme to determine the Legislature's perception of the "nature" of section 290(f). (*Toussie, supra,* at p. 115 [90 S.Ct. at p. 860].)

■ Section 290 "applies automatically to the enumerated offenses, and imposes on each person convicted a lifelong obligation to register." (*In re Reed* (1983) 33 Cal.3d 914, 919 [191 Cal.Rptr. 658, 663 P.2d 216]; *Barrows v. Municipal Court* (1970) 1 Cal.3d 821, 825 [83 Cal.Rptr. 819, 464 P.2d 483].) Registration is mandatory (*People v. Monroe* (1985) 168 Cal.App.3d 1205, 1209 [215 Cal.Rptr. 51]), and is "not a permissible subject of plea agreement negotiation" (*People v. McClellan* (1993) 6 Cal.4th 367, 380 [24 Cal.Rptr.2d 739, 862 P.2d 739]). It is intended to promote the " 'state interest in controlling crime and preventing recidivism in sex offenders.' " (*People v. Monroe, supra,* at p. 1215.) As this court has consistently reiterated: "The purpose of section 290 is to assure that persons convicted of the crimes enumerated therein shall be readily available for police surveillance at all times because the Legislature deemed them likely to commit similar offenses in the future. [Citation.]" (*Barrows v. Municipal Court, supra,* at pp. 825-826; *id.,* at p. 827; *People v. McClellan, supra,* at p. 376, fn. 7; *In re Reed, supra,* at p. 919; *In re Smith* (1972) 7 Cal.3d 362, 367 [102 Cal.Rptr. 335, 497 P.2d 807].) Plainly, the Legislature perceives that sex offenders pose a "continuing threat to society" (*United States v. Bailey* (1980) 444 U.S. 394, 413 [100 S.Ct. 624, 636, 62 L.Ed.2d 575]) and require constant vigilance. (See *In re Parks, supra,* 184 Cal.App.3d at pp. 480-481.)

To this end, a convicted sex offender must register not only on conviction, but whenever "coming into any city, county, or city and county in which he or she temporarily resides or is domiciled . . . ." (§ 290, subd. (a).) Supplemental address change information helps law enforcement agencies keep track of sex offenders who move within the same city or county or are transient. In large cities such as Los Angeles or huge counties like San Bernardino, where offenders can easily relocate without reregistering, section 290(f) seeks to prevent them from disappearing from the rolls. Ensuring offenders are "readily available for police surveillance" (*Barrows v. Municipal Court, supra,* 1 Cal.3d at p. 825) depends on timely change-of-address notification. Without it law enforcement efforts will be frustrated and the statutory purpose thwarted. The statute is thus regulatory in nature, intended to accomplish the government's objective by mandating certain affirmative acts. Compliance is essential to that objective; lack of compliance fatal.

■ Considering section 290(f) in light of the overarching legislative intent and comprehensive statutory scheme governing the registration of sex offenders, we conclude it imposes a continuing duty to give required notification of any change of address (see *Kelly* v. *Municipal Court* (1958) 160 Cal.App.2d 38, 45 [324 P.2d 990]); accordingly, violation of that duty is a continuing offense. A defendant does not commit the crime only at the particular moment the obligation arises, but every day it remains unsatisfied. Given the persistent and palpable threat to society sex offenders represent, "the nature of the crime involved is such that [the Legislature] must assuredly have intended that it be treated as a continuing one." (*Toussie, supra,* 397 U.S. at p. 115 [90 S.Ct. at p. 860]; *United States* v. *Bailey, supra,* 444 U.S. at p. 413 [100 S.Ct. at p. 636]; see also *United States* v. *Cores, supra,* 356 U.S. at p. 408 [78 S.Ct. at p. 878].)

In *In re Parks, supra,* 184 Cal.App.3d 476, the Court of Appeal reached the same conclusion with respect to violation of section 290, subdivision (a). "The statute *does not relieve a person of the duty to register* if he fails to do so within the [then applicable] 30-day time frame. The 30-day period was employed to discourage premature police action and allow a reasonable time to accomplish registration; it was not intended as a signal to sex offenders to 'lay low' for one year [to permit the running of the statute of limitations]. The statute obviously intended the continuing failure to register to be the criminal act." (*In re Parks, supra,* at p. 480.) Thus, "the 'explicit language of the substantive criminal statute [as well as the nature of the crime involved] compels' the conclusion it is a continuing offense." (*Ibid.,* citing *Toussie, supra,* 397 U.S. at p. 115 [90 S.Ct. at p. 860].) Because subdivisions (a) and (f) are integrated components, the same reasoning must apply to both provisions to effectuate the statutory scheme.

We recognize "that the doctrine of continuing offenses should be applied in only limited circumstances . . . ." (*Toussie, supra,* 397 U.S. at p. 115 [90 S.Ct. at p. 860].) Considering the legislative intent pervading section 290, we conclude violation of section 290(f) is one of those "limited circumstances." To hold otherwise would produce an absurd result not reasonably contemplated by the Legislature. (See *Parnell* v. *Superior Court* (1981) 119 Cal.App.3d 392, 407 [173 Cal.Rptr. 906]; *United States* v. *Cores, supra,* 356 U.S. at pp. 409-410 [78 S.Ct. at pp. 878-879]; see also *State* v. *Morse, supra,* 54 N.J. at p. 35 [252 A.2d at p. 725].) Characterizing any violation of section 290 as an instantaneous offense would effectively "eviscerate" the statute. (*In re Parks, supra,* 184 Cal.App.3d at p. 481.) A sex offender's duty to notify of an address change within the same city or county would cease the day after the grace period expired with no further obligation until he or she moved to another city or county. (*Ibid.* [sex offenders could "effectively lose

themselves in the shuffle" if violation were an instantaneous offense]; *United States* v. *Cores, supra,* at p. 409 [78 S.Ct. at p. 878].) Undoubtedly, the Legislature anticipated the very circumstance when it enacted section 290(f). (Cf. *Williams* v. *Superior Court, supra,* 81 Cal.App.3d at p. 344.)

This construction also avoids statute of limitations problems (see *In re Parks, supra,* 184 Cal.App.3d 476) and obvious difficulties of proof "complicated by the obscuration worked both by [the defendant's] own movement and by the passage of time." (*United States* v. *Cores, supra,* 356 U.S. at p. 409 [78 S.Ct. at p. 878].) As the district attorney observes, sex offenders often have a transitory lifestyle or deliberately attempt to keep their movements secret. Requiring a prosecutor to prove when the person moved—information uniquely within that individual's knowledge and control—would hinder or even foreclose many prosecutions under section 290(f). (*State* v. *Morse, supra,* 54 N.J. at p. 35 [252 A.2d at p. 725] ["Surely the burden would not be the State's to prove the precise day or moment upon which the failure [to register] ripened into an offense."].) Impeding vigorous prosecution can only encourage scofflaws, resulting in further violations and compounding "the substantive evil [the Legislature] sought to prevent." (*Toussie, supra,* 397 U.S. at p. 122 [90 S.Ct. at p. 864].)

Recent amendments to section 290 buttress our conclusions. For example, section 290, subdivision (a)(1), now expressly states a sex offender is required to register "for the rest of his or her life" and must annually update registration information. The Legislature also reaffirmed "it is necessary to provide for continued registration" to effectuate the statutory purpose of protecting the safety and general welfare of the public. (Stats. 1996, ch. 908, § 1; see *People* v. *Monroe, supra,* 168 Cal.App.3d at pp. 1212-1213.) The new legislation included California's version of the New Jersey statutes popularly referred to as "Megan's Law." (See Stats. 1996, ch. 908, § 2, codified as § 290, subds. (m) & (n).) These provisions authorize law enforcement agencies to disclose information, including street addresses, about certain high risk sex offenders as well as advise the public of their presence, but only if the address can be verified. (§ 290, subds. (m)(2) & (n)(3); see also § 290.4, subd. (a)(1) & (3).) Maintaining accurate registration information is thus all the more crucial.

Defendant, the Court of Appeal majority, and the dissent place considerable emphasis on the fact section 290(f) requires address change notification "within 10 [now five working] days," after which failure to notify becomes criminal. Defendant argues this "precise time frame[]" delineates the period within which the necessary omissions must occur; any noncompliance outside that period is beyond the statute's reach. We cannot impose such a

narrow construction. "The [10]-day period was employed to discourage premature police action and allow a reasonable time to accomplish registration . . . ." (*In re Parks, supra,* 184 Cal.App.3d at p. 480.) It would be anomalous to construe an act of legislative forbearance as an intent to allow sex offenders to avoid prosecution for noncompliance by concealing their whereabouts until expiration of the statute of limitations period.[3] "It is hardly likely that the [Legislature] would create the . . . sanction only to strip it of much of its effectiveness." (*United States* v. *Cores, supra,* 356 U.S. at pp. 409-410 [78 S.Ct. at p. 879].)

The dissent relies substantially on *Toussie, supra,* 397 U.S. 112, but that decision is distinguishable in several respects. To begin, the case involved a different statutory scheme addressing a different substantive evil enacted by a different legislative body. While the Supreme Court in *Toussie* provided useful guidance for determining whether an offense is continuing in nature, that guidance was advisory only and not premised on any constitutional mandate or general rules of construction. (See *Toussie, supra,* 397 U.S. at p. 133 [90 S.Ct. at p. 870] (dis. opn. of White, J.).) Nor did the court purport to formulate an analytical template applicable to all failure-to-register statutes. On the contrary, it reiterated the fundamental principle that the touchstone of all statutory interpretation is legislative intent. (*Id.* at p. 115 [90 S.Ct. at p. 860]; see, e.g., *Study* v. *State* (Ind.Ct.App. 1992) 602 N.E.2d 1062, 1068 [finding legislative intent that failure to register with securities commissioner constituted continuing offense]; *State* v. *Morse, supra,* 54 N.J. at p. 35 [252 A.2d at p. 725] [finding it "more consonant with the objective of the statute to deem noncompliance [with registration requirement] a continuous offense"]; *John* v. *State, supra,* 96 Wis.2d at pp. 190-192 [291 N.W.2d at pp. 505-506] [finding failure to report change in status of household a continuing offense based on legislative intent].) Perforce, the intention of Congress concerning selective service registration can only marginally, if at all, inform our present inquiry.

---

[3]The dissent expresses concern that construing violation of section 290(f) as a continuing offense creates "a *lifelong* statute of limitations." We acknowledge " '[t]he tension between the purpose of a statute of limitations and the continuing offense doctrine' " (*Toussie, supra,* 397 U.S. at p. 115 [90 S.Ct. at p. 860]), but find it tolerable in this instance for the reasons explained in *In re Parks, supra,* 184 Cal.App.3d at page 481: "First, evidentiary concerns are limited exclusively to whether the sex offender has registered [or failed to notify]. Passage of time is not likely to obscure the absence or presence of such a record. Second, prompt investigation of suspected criminal behavior will not be fostered. Section 290 was enacted to deter recidivism by facilitating the apprehension of repeat offenders. [Citation.] The absence of a registrant could go undetected when he fails to notify authorities and is not sought by them. Third, the Legislature has created a registration procedure for sex offenders because they are more likely to commit repeated sex offenses. It has determined 'self-reformation' is unlikely and continued surveillance is necessary." (Fn. omitted; cf. *Toussie, supra,* 397 U.S. at pp. 114-115 [90 S.Ct. at p. 860].)

Furthermore, although the high court was "convinced" that construing failure to register for the draft as an instantaneous offense would not "significantly impair either the essential function of raising an army or the prosecution of those who fail to register" (*Toussie, supra,* 397 U.S. at p. 123 [90 S.Ct. at p. 864]), for the reasons discussed above we are not similarly convinced regarding section 290(f). As long as a reasonable number of eligible draftees comply, the noncompliance of some will not discernibly frustrate the purpose of selective service registration. By contrast, failure by *any* sex offender to comply with any provision of section 290, including subdivision (f), would substantially undermine the goal of assuring that such persons "shall be readily available for police surveillance at all times . . . ." (*Barrows* v. *Municipal Court, supra,* 1 Cal.3d at p. 825.) The very nature of the "substantive evil [the Legislature] sought to prevent" virtually compels our conclusion since "each day's acts [leaving the offender's location unknown] bring a renewed threat." (*Toussie, supra,* 397 U.S. at p. 122 [90 S.Ct. at p. 864]; *United States* v. *Bailey, supra,* 444 U.S. at p. 413 [100 S.Ct. at p. 636].)

Because we conclude violation of section 290(f) is a continuing offense, we must reject defendant's constitutional claim. ■ By its very nature, a continuing offense does not implicate ex post facto considerations because the law does not "change[] the legal consequences of acts *completed* before its effective date." (*Weaver* v. *Graham* (1981) 450 U.S. 24, 31 [101 S.Ct. 960, 965, 67 L.Ed.2d 17], italics added.) It operates solely with respect to subsequent conduct. "If the conduct, condition, or failure to act continues after the enactment or amendment of the statute in question, this statute may be applied without violating the ex post facto prohibition." (1 LaFave & Scott, Substantive Criminal Law (1986) § 2.4, p. 142.) Simply put, "ex post facto" means "after the fact"; it does not mean "during the fact." It therefore does not encompass offenses for which the defendant is prosecuted or punished based on acts continuing beyond a change in the law.

The United States Supreme Court acknowledged this principle almost three-quarters of a century ago in *Chicago & Alton R. R.* v. *Tranbarger* (1915) 238 U.S. 67 [35 S.Ct. 678, 59 L.Ed. 1204], a case involving a state statute that required railroads to construct water outlets across their rights-of-way. The railroad company had constructed a solid embankment 12 years prior to passage of the act and was penalized for noncompliance. Rejecting the railroad's constitutional argument, the high court explained: "The argument that in respect of its penalty feature the statute is invalid as an *ex post facto* law is sufficiently answered by pointing out that plaintiff in error is subjected to a penalty not because of the manner in which it originally constructed its railroad embankment, nor for anything else done or omitted

before the passage of the act of 1907, but because after that time it maintained the embankment in a manner prohibited by that act." (*Id.* at p. 73 [35 S.Ct. at p. 680]; *Samuels* v. *McCurdy* (1925) 267 U.S. 188, 193 [45 S.Ct. 264, 265, 69 L.Ed. 568, 37 A.L.R. 1378]; see *People* v. *Packard* (1982) 131 Cal.App.3d 622, 627 [182 Cal.Rptr. 576]; *People* v. *McCloskey* (1926) 76 Cal.App. 227, 229-230 [244 P. 930].)

The same rationale applies when the law imposes an affirmative duty the defendant continues to flout. (*People* v. *Stanley* (1917) 33 Cal.App. 624, 626 [166 P. 596]; *DeHart* v. *State* (Ind.Ct.App. 1984) 471 N.E.2d 312, 315.) Each day renews the offense regardless of when the defendant first defied the obligation. Accordingly, the viability of the prosecution may be measured by any successive violation, including one committed after a change in the law. Only the last offense is of any legal moment; the first is immaterial. This analysis applies whether the change criminalizes previously innocent conduct (*People* v. *Stanley, supra,* 33 Cal.App. at p. 626; *People* v. *Caruso* (1987) 152 Ill.App.3d 1074, 1077-1078 [105 Ill.Dec. 821, 504 N.E.2d 1339, 1341]; *U.S.* v. *Layne* (5th Cir. 1995) 43 F.3d 127, 132), increases the penalty (*U.S.* v. *Walker* (9th Cir. 1994) 27 F.3d 417, 419-420; *U.S.* v. *Kohl* (9th Cir. 1992) 972 F.2d 294, 297), or alters the status of the crime (*People* v. *Abedi* (1993) 156 Misc.2d 904, 912 [595 N.Y.S.2d 1011, 1018]; *People* v. *Rosenberg* (1978) 93 Misc.2d 965, 967 [404 N.Y.S.2d 246, 248]; *McRay* v. *Com.* (Ky.Ct.App. 1984) 675 S.W.2d 397, 401).

For example, in *McRay* v. *Com., supra,* 675 S.W.2d 397, the defendant had begun growing marijuana when the crime was classified as a misdemeanor and continuously cultivated marijuana plants until after it became a felony. On appeal, he contended his felony conviction was an ex post facto application of the law. (*Id.* at p. 400.) The court rejected this argument as "inapplicable" because it found "the cultivation of marijuana is a continuing offense. If McRay was growing the marijuana crop, or knew that it was planted and growing on his land, he was guilty of the crime at any and all times. He could have been charged . . . before or after the penalty was modified." (*Id.* at p. 401.)

██ Here, it appears defendant first failed to inform the Buena Park Police Department of his address change in November 1994 when the omission was a misdemeanor. The information alleged defendant violated section 290(f) during the period from February 1 through March 23, 1995, after the Legislature had reclassified it a felony. As of January 1, 1995, he had been on notice his *continued* failure to notify authorities would constitute the more serious offense. (See *Chicago & Alton R. R.* v. *Tranbarger, supra,* 238 U.S. at p. 74 [35 S.Ct. at pp. 680-681].) Defendant thus had "fair

warning" (*Weaver* v. *Graham, supra*, 450 U.S. at p. 28 [101 S.Ct. at p. 964]), and the prosecution was predicated on facts arising after the change in the law. Under the circumstances, we find no ex post facto violation.

## DISPOSITION

The judgment of the Court of Appeal is reversed. The cause is remanded to the Court of Appeal with directions to vacate the writ of mandate.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

MOSK, J.—I dissent. The majority's singular misdefinition of a continuing offense promises to create serious difficulty for the trial and appellate courts that must follow it. Today's result, moreover, is inconsistent with the teaching of *Toussie* v. *United States* (1970) 397 U.S. 112 [90 S.Ct. 858, 25 L.Ed.2d 156] (*Toussie*), among other cases. And precisely for the reasons the majority identify—e.g., the indefinite extension of the statute of limitations and the elimination of ex post facto protections—they create deleterious policy that undermines a legislative balance between the needs to protect the public from recidivism and to protect individuals against arbitrary and retroactive punishment. The resulting imbalance may cause a miscarriage of justice against defendant. We should affirm the Court of Appeal's judgment and leave it to the Legislature to change the statute if it desires to do so.

The People, represented by a district attorney, prosecuted defendant for violating subdivision (f) of Penal Code section 290. They first filed a felony information even though they alleged that defendant violated subdivision (f) "[o]n or about and between November 1994 and March 23, 1995." In 1994 the violation was, with respect to the charges against defendant, a misdemeanor. (Former § 290, subd. (g)(1).) The People acknowledged that their pleading was defective and sought leave to amend it to charge him with violating the law "[o]n or about and between February 1, 1995 and March 23, 1995."

In 1995 a violation of subdivision (f) of Penal Code section 290 was a felony. (*Id.*, subd. (g)(2).) At a hearing, defendant aptly described this procedure as giving the People "the privilege of picking and choosing . . . to decide when the crime was committed . . . ." "In other words," he stated, "the prosecution by their very pleading could willy nilly decide to ignore the very proof that they necessarily rely upon, which is necessarily tied up in November or December, 1994 and simply assert a date of January [*sic*] 1st."

The court nevertheless ruled that "[f]ailure to register is [a] continuing offense" and allowed the People to file the amended information.

Defendant contended that this procedure violates the ex post facto clauses (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9). He renews that contention in this court. He is correct. Properly understood, a continuing offense was not charged, and therefore it could not be charged as a felony.

Penal Code section 290, subdivision (f), provided in 1994, when defendant committed his offense: "If any person required to register pursuant to this section changes his or her residence address, the person shall inform, in writing within 10 days, the law enforcement agency or agencies with whom he or she last registered of the new address. The law enforcement agency or agencies shall, within three days after receipt of this information, forward it to the Department of Justice. The Department of Justice shall forward appropriate registration data to the law enforcement agency or agencies having local jurisdiction of the new place of residence." Its language was identical in all material respects in 1995.

We interpret the federal and state ex post facto clauses identically. (*People v. McVickers* (1992) 4 Cal.4th 81, 84 [13 Cal.Rptr.2d 850, 840 P.2d 955]; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 295-296 [279 Cal.Rptr. 592, 807 P.2d 434].) Accordingly, United States Supreme Court precedent not only is binding with respect to the federal clause, but is persuasive with respect to the clause in the California Constitution.

"The *Ex Post Facto* Clause is a limitation upon the powers of the Legislature [citation], and does not of its own force apply to the Judicial Branch of government. [Citation.] But the principle on which the Clause is based—the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty. [Citations.] As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment." (*Marks v. United States* (1977) 430 U.S. 188, 191-192 [97 S.Ct. 990, 992-993, 51 L.Ed.2d 260].)

In *California Dept. of Corrections v. Morales* (1995) 514 U.S. 499, 506-507, footnote 3 [115 S.Ct. 1597, 1602, 131 L.Ed.2d 588, 594, 595], the court clarified that the ex post facto clause applicable to the states is to be analyzed under the analytical framework set forth in *Collins v. Youngblood* (1990) 497 U.S. 37 [110 S.Ct. 2715, 111 L.Ed.2d 30]. *Collins* reaffirmed (*id.* at pp. 42-43, 44 [110 S.Ct. at pp. 2719-2720]) the understanding of the ex post facto clause provided in *Beazell v. Ohio* (1925) 269 U.S. 167, 169-170 [46 S.Ct. 68, 68, 70 L.Ed. 216], namely "that any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission,

or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*." But *Collins* explained that the third prong of *Beazell*'s formulation is "linked to the prohibition on alterations in 'the legal definition of the offense' or 'the nature or amount of the punishment imposed for its commission.'" (497 U.S. at p. 50 [110 S.Ct. at p. 2723], quoting *Beazell.*) Hence *Collins* was able to simplify *Beazell*, and summarized: "Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." (*Id.* at p. 43 [110 S.Ct. at p. 2719].) In *Morales*, the court reiterated this understanding. (514 U.S. at p. 504 [115 S.Ct. at p. 1601, 131 L.Ed.2d at p. 594]; see also *Lynce* v. *Mathis* (1997) 519 U.S. __ [117 S.Ct. 891, 137 L.Ed.2d 63].)

Hence "[t]he *ex post facto* clause of the Constitution 'forbids the application of any law or rule that increases punishment for pre-existing conduct.' [Citations.] Where a 'continuing offense' straddles the old and new law, however, applying the new is recognized as constitutionally sound." (*U.S.* v. *Regan* (1st Cir. 1993) 989 F.2d 44, 48.) That is so because "[t]he critical question is whether the law changes the legal consequences of acts completed before its effective date." (*Weaver* v. *Graham* (1981) 450 U.S. 24, 31 [101 S.Ct. 960, 965, 67 L.Ed.2d 17].)

What the majority do today is to misconstrue subdivision (f) of Penal Code section 290 as a continuing offense, thereby creating the possibility of increased retroactive punishment to defendant's detriment. I believe the majority's decision so radically departs from commonly understood principles of commission and completion of crimes as to be unforeseeable to this defendant or any other individual.

Only by heaping error upon error are the majority able to reach such a surprising result.

The majority's first error lies in their definition of a continuing crime. Taking California law to the outer orbit of an obscure 1978 Maryland decision, the majority identify a continuing offense as "'marked by a continuing duty in the defendant to do an act which he fails to do. The offense continues as long as the duty persists, and there is a failure to perform that duty.'" (Maj. opn., *ante*, at p. 525, quoting *Duncan* v. *State* (1978) 282 Md. 385, 390 [384 A.2d 456, 459].) But *Duncan*'s definition, unsupported by any authority, is erroneous—at a minimum, it is too vague, and it puts the wrong foot forward.

Failing to observe a continuing duty and continuing to engage in proscribed conduct are distinct matters. The first, an issue of status, has nothing

to do with the doctrine of continuous offenses. "The theory of the [majority] is that by doing nothing [further, defendant] renewed his crime every day to the date of the trial . . . . This seems to me not to be in accord with authority, [even] when the thing that is made a crime is the failure to perform a continuing duty, when nothing at all happens after the crime became complete. In United States v. Irvine [(1879)] 98 U.S. 450, 25 L.Ed. 193, the crime was for an agent or attorney 'wrongfully to withhold' pension money from a pensioner. The duty to pay it over was certainly a continuing one, but the court held the statute of limitations applied, and began to run so soon as it was evident that the withholding was wrongful." (*Fogel* v. *United States* (5th Cir. 1947) 162 F.2d 54, 56 (dis. opn. of Sibley, J.).)

In sum, the crime must forbid *conduct* that continues (*U.S.* v. *Midstate Co.* (1939) 306 U.S. 161, 166 [59 S.Ct. 412, 414, 83 L.Ed. 563]), not just a *status* that continues as the majority, following the erroneous decisions in *Duncan* v. *State, supra,* 282 Md. 385 [384 A.2d 456], and *State* v. *Morse* (1969) 54 N.J. 32 [252 A.2d 723], would have it. Indeed, the majority's analysis falls of its own weight: it states " 'each day's acts [leaving the offender's location unknown] bring a renewed threat.' " (Maj. opn., *ante,* at p. 531.) How, paraphrasing the majority's words, can it be an *act* to leave one's own location unknown? No *conduct* is occurring—nothing is happening.[1]

Unlike the quixotic two-decades-old Maryland decision[2] on which the majority principally rely, other jurisdictions have made sense of the continuing-offense doctrine. " 'A continuing offense is a continuous, unlawful act or

---

[1]And the majority misunderstand *Study* v. *State* (Ind.Ct.App. 1992) 602 N.E.2d 1062. The crime declared to be continuing was "loan brokering without first registering" (*id.* at p. 1068), not merely failing to register.

[2]The drafter of the People's opening brief stated that *Duncan* offered "[t]he clearest explanation . . . this writer has discovered . . . ." The majority venture no farther. Surely this court can do better. *Fogel* reveals that *Duncan* is a loose nail on which to hang the definition of a continuing offense for all California courts.

After providing its dubious definition of a continuing offense the Maryland court incorrectly gave, as an example of a continuing offense, "failure to register for the draft, *Fogel* v. *United States,* 162 F.2d 54, 55 (5th Cir.), *cert. denied,* 332 U.S. 791, 68 S.Ct. 99, 92 L.Ed. 373 (1947), *rev'd per curiam on other grounds,* 335 U.S. 865, 69 S.Ct. 136, 93 L.Ed. 411 (1948) . . . ." (*Duncan* v. *State, supra,* 384 A.2d at p. 459.)

This citation was wrong on two points. Most important for this case, the majority opinion in *Fogel* in fact was disapproved in *Toussie* on the precise point *Duncan* attempted to make. (*Toussie, supra,* 397 U.S. at p. 121 & fn. 17 [90 S.Ct. at p. 863].) *Toussie* was decided some years before *Duncan,* and the evident lapse in the Maryland court's research is inexcusable. Also, contrary to *Duncan, Fogel* v. *United States, supra,* 162 F.2d 54, was *not* reversed. Rather, certiorari was denied. (*Fogel* v. *United States* (1947) 332 U.S. 791 [68 S.Ct. 99, 92 L.Ed. 373].) What the United States Supreme Court reversed was another cause involving the same defendant. (*Fogel* v. *United States* (5th Cir. 1948) 167 F.2d 763, revd. *per curiam* (1948) 335 U.S. 865 [69 S.Ct. 136, 93 L.Ed. 411].)

To rely on a Maryland case revealing such ineptitude is, on its face, to err.

series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy.' " (*U.S.* v. *Midstate Co.*, *supra*, 306 U.S. at p. 166 [59 S.Ct. at p. 414].) A crime should not be defined as continuing "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." (*Toussie, supra*, 397 U.S. at p. 115 [90 S.Ct. at p. 860].) The Model Penal Code contains a similar caveat. (Model Pen. Code, § 1.06, subd. (4).)

*U.S.* v. *McGoff* (D.C. Cir. 1987) 831 F.2d 1071 [265 App.D.C. 312], accurately explained the requirement of continuing proscribed conduct: "The notion of 'continuing offense' has traditionally identified a type of offense fundamentally different from most known to the common law. . . . [A] criminal offense is typically completed as soon as each element of the crime has occurred. For example, a larceny is completed as soon as there has been an actual taking of the property of another without consent, with the intent permanently to deprive the owner of its use. The offense does not 'continue' over time. The crime is complete when the act is complete. A 'continuing offense,' in contrast, is [one that consists of] an unlawful course of *conduct* that does perdure." (*Id.* at p. 1078, italics added.)

An interpretation of bigamy and bigamous cohabitation prohibitions illustrates the distinction between conduct and status. It has been held that bigamy is not a continuing crime, although the accused's status as a bigamist may well "perdure," to use *McGoff*'s term, but that bigamous cohabitation is a continuing crime because the proscribed conduct of bigamous cohabitation does perdure. (*United States* v. *Lee* (N-M.C.M.R. 1991) 32 M.J. 857, 860-861.)

Hence, "[t]he classic example of a continuing offense is conspiracy." (*U.S.* v. *McGoff, supra*, 831 F.2d at p. 1078.) The crime by its nature continues until the last act is done. (*Toussie, supra*, 397 U.S. at p. 122 [90 S.Ct. at p. 864].) Similarly, such crimes as possession of forbidden material and kidnapping, a substantial component of which is the continuing detention of another against his or her will, are among the few continuing offenses. (E.g., *People* v. *Bland* (1995) 10 Cal.4th 991, 995, 999 [43 Cal.Rptr.2d 77, 898 P.2d 391] [possession of cocaine base for sale]; *People* v. *Keehley* (1987) 193 Cal.App.3d 1381, 1385-1386 [239 Cal.Rptr. 5] [unlawful possession of food stamps]; *Parnell* v. *Superior Court* (1981) 119 Cal.App.3d 392, 407-408 [173 Cal.Rptr. 906] [kidnapping]; see also *People* v. *Ordonez* (1991) 226 Cal.App.3d 1207, 1231 [277 Cal.Rptr. 382] [same].)

The majority's second error, which arises naturally from their first, lies in the interpretation of the statute at issue. Defendant's alleged offense could

not be continuous under the crime charged—he did not continue to fail to "inform, in writing *within 10 days*, the law enforcement agency or agencies with whom he or she last registered of the new address." (Pen. Code, former § 290, subd. (f), italics added.) He violated the statute instantaneously, finally and completely 10 days after he moved without informing the relevant agencies, if he did so. "[N]othing at all happen[ed] after the crime became complete." (*Fogel* v. *United States, supra*, 162 F.2d 54, 56 (dis. opn. of Sibley, J.); to the same effect, *U.S.* v. *McGoff, supra*, 831 F.2d at p. 1078.)

The offense in this case is legally indistinguishable from that at issue in the Vietnam-era *Toussie* case, wherein the United States Supreme Court found the offense not to be continuing. Toussie was convicted of failing to register for the draft. He argued that the statute of limitations had run. The court agreed, prefacing its discussion by explaining that " '[t]he tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent; the latter, for all practical purposes, extends the statute beyond its stated term.' " (397 U.S. at p. 115 [90 S.Ct. at p. 860].)

The law in *Toussie* required that male United States citizens between 18 and 26 years old register for the draft. It further provided, via presidential proclamation, that " '[p]ersons who were born on or after September 19, 1930, shall be registered on the day they attain the eighteenth anniversary of the day of their birth, or within five days thereafter.' Since Toussie, an American citizen, was born on June 23, 1941, he was required to register sometime between June 23 and June 28, 1959. He did not do so during that period or at any time thereafter. On May 3, 1967, he was indicted for failing to register and that indictment led to the conviction under review." (397 U.S. at p. 113 [90 S.Ct. at p. 859], fn. omitted.)

The court held that a five-year statute of limitations applied to bar the prosecution. It explained the reasons for statutes of limitation, and commented: "These principles indicate that the doctrine of continuing offenses should be applied in only limited circumstances . . . . These considerations do not mean that a particular offense should never be construed as a continuing one. They do, however, require that such a result should not be reached unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." (*Toussie, supra*, 397 U.S. at p. 115 [90 S.Ct. at p. 860].)

Having explained that a statute must either explicitly declare that a crime is of a continuing nature, or the definition of the crime must require such a conclusion, *Toussie* gave an example of the second type: "Cf. *United States*

v. *Cores*, 356 U.S. 405 [78 S.Ct. 875, 2 L.Ed.2d 873] (1958), in which the Court held, for venue purposes, that the statute prohibiting alien crewmen from remaining in the United States after their permits expired contemplated that the offense would continue as long as the crewman remained in this country and the statute of limitations did not start to run when he first overstayed his permit. In that case we stated that '[s]ection 252 (c) punishes "[a]ny alien crewman who willfully remains in the United States in excess of the number of days allowed." The conduct proscribed is the affirmative act of willfully remaining, and the crucial word "remains" permits no connotation other than continuing presence.' *Id.*, at 408 [78 S.Ct. at p. 878]. See also *Armour Packing Co.* v. *United States*, 209 U.S. 56 [28 S.Ct. 428, 52 L.Ed. 681] (1908), in which we held that, for venue purposes, violations of the Elkins Act, 32 Stat. 847, were continuing offenses. In that case the statute specifically provided that '[e]very violation . . . shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed or through which the transportation may have been conducted . . . .' *Id.*, at 73 [28 S.Ct. at p. 432]." (397 U.S. at pp. 120-121, fn. 16 [90 S.Ct. at p. 863].)

Referring to the draft registration law's history, the court continued, in language particularly relevant to the case at hand: "There is also nothing inherent in the act of registration itself which makes failure to do so a continuing crime. Failing to register is not like a conspiracy which the Court has held continues as long as the conspirators engage in overt acts in furtherance of their plot. [Citations.] It is in the nature of a conspiracy that each day's acts bring a renewed threat of the substantive evil Congress sought to prevent. The fact that the first draft registrations clearly were viewed as instantaneous events and not a continuing process indicates that there is nothing inherent in the nature of failing to register that makes it a continuing offense." (*Toussie, supra*, 397 U.S. at p. 122 [90 S.Ct. at p. 864].)

The majority's third error is to drift into the Sargasso Sea of what they call "the broader statutory scheme" (maj. opn., *ante*, at p. 527), where their analysis, not surprisingly, is becalmed. They concede that the language of Penal Code section 290, subdivision (f), does not establish a continuing offense. They state their intention to determine whether " 'the nature of the crime involved is such that [the Legislature] must assuredly have intended that it be treated as a continuing one.' " (Maj. opn., *ante*, at p. 526, quoting *Toussie*.) But section 290, subdivision (f), does not create a continuing crime; a fortiori, it reveals no intent to treat a violation of the crime as continuing.

The majority's contrary conclusion rests on the statement that "[e]nsuring offenders are 'readily available for police surveillance' [citation] depends on

timely change of address notification. Without it law enforcement efforts will be frustrated and the statutory purpose thwarted." (Maj. opn., *ante*, at p. 527.)

But when the offender fails to register, the police do not know his or her whereabouts and the harm has occurred. The "substantive evil" the Legislature sought to prevent is prevented, if at all, by punishing failure to register, and not by construing the offense as continuing indefinitely. Such an interpretation may undermine the legislative purpose, for it may encourage convicted sex offenders never to reveal their whereabouts once they have initially violated the law. At a minimum, even under the majority's erroneous approach of trying to divine legislative intent in the face of clear statutory language, it cannot be said that the Legislature "must assuredly have intended that [the offense] be treated as a continuing one." (*Toussie, supra*, 397 U.S. at p. 115 [90 S.Ct. at p. 860].)[3]

There are other errors. The majority declare that "when the law imposes an affirmative obligation to act, the violation is *complete* at the first instance the elements are met. It is nevertheless not *completed* as long as the obligation remains unfulfilled." (Maj. opn., *ante*, at p. 526.) That analysis is plainly incorrect in the context of the statute before us, and in any event it begs the question whether defendant completed the crime when he allegedly failed to register 10 days after moving.

And it may or may not be true that "[s]imply put, 'ex post facto' means 'after the fact'; it does not mean 'during the fact.' It therefore does not encompass offenses for which the defendant is prosecuted or punished based on acts continuing beyond a change in the law." (Maj. opn., *ante*, at p. 531.) But again that comment begs the question when defendant completed the alleged offense, if he committed it.

It is worth recalling that the United States Supreme Court expressed concern in *Toussie* that defining failure to register for the draft would expand the five-year statute of limitations to thirteen years. Given the lack of

---

[3] This is so despite *United States* v. *Bailey* (1980) 444 U.S. 394 [100 S.Ct. 624, 62 L.Ed.2d 575], in which the court mentioned that escape from federal custody must be a continuing offense because "[g]iven the continuing threat to society posed by an escaped prisoner, 'the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one.' " (*Id.* at p. 413 [100 S.Ct. at p. 636].) *Bailey* did not overrule *Toussie*, however; in fact it relied on it but explained that "the tension between the doctrine of continuing offenses and the policy of repose embodied in statutes of limitations . . . . is wholly absent where, as in the case of [the escape statute], the statute of limitations is tolled for the period that the escapee remains at large." (*Id.* at pp. 413-414 [100 S.Ct. at p. 636].) *Bailey* should be read to state an unusual exception to *Toussie*'s general rules. (See also *U.S.* v. *Vowiell* (9th Cir. 1989) 869 F.2d 1264, 1268-1269.)

statutory support for their conclusion, the majority seem remarkably unconcerned about imposing, among other burdens, increased punishment in violation of the ex post facto clause on this defendant and a *lifelong* statute of limitations on any other who commits the crime of failing to register as a sex offender.

Ironically, defendant would probably be the first to agree with the majority's assertion that "lack of compliance [is] fatal." (Maj. opn., *ante*, at p. 527.) The question before us evidently is not trivial for this defendant. His lawyer stated at the preliminary hearing: "[T]his is a case where my client is looking at three strikes. He is 52 years old. It's effectively going to be a death sentence because he failed to register as a sex offender within ten days, not because he has picked up a new case."

Congress evidently disliked *Toussie*. It amended federal law to make failure to register for the draft a continuing offense. (*U.S.* v. *Kerley* (7th Cir. 1988) 838 F.2d 932, 935.) Our Legislature can do the same if it wishes with regard to subdivision (f) of Penal Code section 290. We should not usurp its province. I do not doubt the sincerity of the majority's belief that today's decision bolsters legislative intent, but in fact the contrary is true: their decision undermines the meaning of the federal and state ex post facto clauses, which as constitutional provisions embody the will of the people of the United States and of California, respectively. (See *U.S. Term Limits, Inc.* v. *Thornton* (1995) 514 U.S. 779, 821, fn. 31 [115 S.Ct. 1842, 1864, 131 L.Ed.2d 881, 911].) In balancing the need to protect the public from possible recidivism with the desirability of forbidding retroactive punishment, as with most other matters involving conflicting policies, lawmaking bodies "possess superior resources with which to weigh all potentially affected interests." (*DeLoach* v. *Companhia de Navegacao Lloyd Brasileiro* (3d Cir. 1986) 782 F.2d 438, 441.)

A few final paragraphs are in order regarding this case. If defendant's counsel is correct that he is facing a three strikes term if convicted of violating Penal Code section 290, subdivision (f), he may be sentenced to twenty-five years to life imprisonment for misdemeanor recidivism. (Pen. Code, §§ 667, subd. (e)(2)(A), 1170.12, subd. (c)(2)(A).) Such a result would be intolerable.

First, the punishment would be disproportionate to the crime. No matter how unsavory defendant's past may be, a sentence up to life imprisonment for a current misdemeanor is baroque and medieval in concept and inconsistent with the fundamental principles of a just society.

Second, "the *Ex Post Facto* Clause not only ensures that individuals have 'fair warning' about the effect of criminal statutes, but also 'restricts governmental power by restraining arbitrary and potentially vindictive legislation.'" (*Landgraf* v. *USI Film Products* (1994) 511 U.S. 244, 266-267 [114 S.Ct. 1483, 1498, 128 L.Ed.2d 229].) What could be more arbitrary and potentially vindictive than allowing the People, as defendant argued, to "pick[] and choos[e] . . . when the crime was committed . . ."? Under the majority's reasoning, which deprives defendant of ex post facto protection, even if he were brought to trial in 2010 the People could choose, *at their pleasure*, any date between 1994 and that trial date to charge commission of the offense, no matter what the penal consequences. This amounts to justice gone awry.

Under the majority's rationale, the consequences of the exercise of the district attorney's pleasure may have more severe effects on defendant than would otherwise be the case. If he can "pick[] and choos[e] . . . when the crime was committed . . . ," the effect will be to subject defendant to an indefinite statute of limitations and the maximum possible punishment that may have existed at any time between commission (and completion) of the offense and the date of trial. The law does not support such an arcane result, and neither can I.

The Court of Appeal's judgment should be affirmed.