[No. H022010. Sixth Dist. June 27, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
CLIFFORD LAMAR JACKSON, JR., Defendant and Appellant.

1626

### COUNSEL

Karen W. Riley, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**PREMO, J.**—Defendant Clifford Lamar Jackson, Jr., acting in propria persona, was convicted of one count of failing to register as a sex offender (Pen. Code, § 290, subd. (g)(2)),[1] five prior "Three Strikes" convictions were found true, and he was sentenced to prison for 25 years to life. On appeal, he raises numerous issues relating to due process violations and the denial of assistance of counsel and of a fair trial. He also complains that his sentence violated the double jeopardy clause and the Eighth Amendment of the federal Constitution. In a petition for a writ of habeas corpus which this court previously ordered considered with the appeal, he raises issues relating to the denial of counsel and a fair trial. We have disposed of the habeas corpus petition by separate order filed this day. (See Cal. Rules of Court, rule 24(a).)

### FACTS

On April 13, 1998, at approximately 11:00 p.m., San Jose Police Officers Kevin McMillin and Jim Menard[2] stopped defendant as he was walking on Monterey Highway because his "gait appeared slightly unsteady." Believing he was the victim of racial profiling,[3] defendant called Menard a "racist Mark Furman cop." The officers ran a record check and discovered that defendant was a prior sex offender subject to registration under section 290 and discovered that his last registration was on March 10, 1997. They arrested defendant for being drunk in public (§ 647, subd. (f)), and on searching him, found a registration card dated October 23, 1997, listing his address as 2055 Baldwin Court in Seaside.

---

[1]Further statutory references are to the Penal Code unless otherwise stated.

[2]Two spellings of the officer's name, "Menard" and "Maynard," appear in the record.

[3]Section 13519.4, subdivisions (d) and (e), prohibits racial profiling, which is defined as the practice of police officers of "detaining a suspect based on a broad set of criteria which casts suspicion on an entire class of people without any individualized suspicion of the particular person being stopped."

Officer McMillin telephoned the phone number for that address and spoke to defendant's father, Clifford Lamar Jackson, Sr., who told them defendant had not been living at that address for approximately six to eight months. He said he believed defendant was living and working somewhere in San Jose. The senior Mr. Jackson had Alzheimer's disease, but it was not apparent to the officers from the telephone call. Evidence of his statement was admitted at trial not for the truth of what Mr. Jackson told McMillin, "but for [McMillin's] further investigation, why [defendant] was arrested." After the telephone call, defendant was arrested on an additional charge of violating section 290. Count 1 was for failing to register with the police in San Jose within five working days of coming into that city, and count 2 alleged defendant failed to inform the Seaside Police Department where he was registered, in writing, within five working days, of his new address. The information alleged five strike priors.

Defendant was initially represented by the public defender's office, but on April 16, 1999, he was granted the right to represent himself under *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562]. He conducted his own defense at the preliminary examination and thereafter filed numerous pretrial motions.[4] As the August 25 trial date approached, however, defendant decided he was not qualified to conduct his own defense

---

[4]On May 12, 1999, defendant filed (1) a "Motion to Dismiss for Violation of Due Process Based on any Kind of Unfair Conduct by the Court. (Amended)." It alleged the court failed to grant his requests for a private investigator and tools to prepare for an affirmative defense at his preliminary hearing. This was accompanied by a handwritten letter to the judge requesting dismissal of the case because it "has clearly gotten out of the Court's hands. . ." and because of "unfair practice by the Court . . . ." On May 21, 1999, defendant submitted motions (2) through (5): (2) was a motion to dismiss for failure to comply with discovery requests. Defendant requested a copy of the police report of his arrest, the "actual audio tapes" of the conversation with his father on the night of the arrest and "post-arrest," Dr. Rozynko's psychoanalysis report on defendant, copies of his father's medical records and release forms, a list of witnesses and statements the prosecutor intended to present at trial including expert witnesses, all notes and memoranda by the investigating officers including conversations with the district attorney in Monterey County; (3) another motion to dismiss based on the first motion which alleged a violation of defendant's substantial rights because of denial of an investigator and tools to prepare for a defense at his preliminary hearing; (4) a third motion to dismiss on the same grounds, however this motion contained defendant's declaration stating he was not given a copy of the court order granting in propria persona status and he should have been given a "Pro Per Policy and Procedure Packet within two (2) Court days"; and (5) a second motion to dismiss for failure to comply with discovery requests. On June 9, 1999, defendant filed motion (6) to suppress evidence of his father's statements as fruit of an illegal search based on the incorrect information that defendant's last registration was on March 10, 1997, when it was actually timely on October 23, 1997, and because of defendant's "purport-edly abusive language, . . ." On June 17, 1999, defendant filed motion (7) for a continuance because he had not been provided with a private investigator or the transcripts from his April 28, 1999, preliminary hearing. On June 25, 1999, defendant filed motion (8) for the appoint-ment of advisory counsel because defendant as a "layman of the Law" "needs adequate assistance to litigate this case 'Properly.' " (Original underscoring.) Defendant requested "an

at trial. On June 25, he filed a motion for advisory counsel and on August 13 and August 23, defendant orally moved for a continuance in order to secure retained counsel. The motion on August 13 was summarily denied but on August 23, the trial court gave defendant a day and a half to get an attorney "to come into court on that day and indicate to us that he or she is ready to represent you . . . ." The court told defendant that if the attorney wanted more time to prepare, the court would "show him or her how to go about . . . asking Judge Garibaldi for a motion to continue. . . . But otherwise we have got to get started on the case in some fashion. . . . [¶] We have got to have deadlines. . . . Otherwise . . . it is safe to assume you are representing yourself because of all the motions and all that you brought, we can actually start bringing, starting the trial, in limine motions and jury selection. [¶] [DEFENDANT]: That sounds pretty fair, Your Honor." On August 25, no attorney was present with defendant. When the court stated it would proceed with in limine motions, defendant stated, "I would like to disqualify myself to being pro per." Defendant explained, "I can't litigate this case. I was—never given a legal runner. I was never given a private investigator. I don't have any of the materials or the witness lists to give to the Madam D.A. So I am disqualifying myself at this time." The court found the request untimely and stated that defendant did not state "the basis that requires that I appoint a lawyer to represent you." Defendant announced that he would not

'advisory counsel' who is not a member of the 'Public defender's farm.' " (Original underscoring.) On June 30, defendant filed motion (9), a section 1538.5 motion to dismiss evidence of his registration card and the statements by his father because there was no justification for the detention. On July 1, defendant filed motion (10) for disclosure of the personnel files of Officers Menard and McMillin. (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (*Pitchess*).) A handwritten notation apparently on a Post-It note attached to the motion reads "*Pitchess* [¶] [Defendant] did not serve the City Attorney." On July 7, defendant filed motions (11) and (12). Motion (11) was to dismiss for violation of "Due Process Base [*sic*] on Any Kind of Unfair Conduct by the Court" for failing to grant a private investigator and motion (12) was a renewal of the *Pitchess* motion. On July 15, defendant filed motion (13) for disqualification of the presiding judge from "control of this matter. . . . (Prejudiced against my Person)" (Code Civ. Proc., § 170.6) and (14) for motions in limine. On July 19 in motion (15) and on August 3 in motion (16) defendant renewed his *Pitchess* motion. Defendant also filed motion (17), another motion to disqualify the judge on August 3, and motion (18) to dismiss the action pursuant to section 995. Defendant alleged the evidence was insufficient, official court documents were falsified, and the denial of an investigator was a denial of his substantial rights. On August 6, in motion (19), defendant renewed his *Pitchess* motion. The trial started on August 25, 1999, and on August 27, defendant filed (20) a "Motion to Withdraw as Propria Persona Attorney, Pursuant to Civil Code #284 [*sic*], and U.S. Constitution 6th Amendment, Effective Counsel." Defendant stated he had "made an erroneous decision to act in status of my own attorney. And that my ability to really understand the Law and application of the Law in a Trial-setting is very limited. And would constitute a clear unfair advantage against me in this court proceeding. . . . It is obvious as I muck through the cryptic Codes of Criminal Law, with there [*sic*] double meanings, that I, Clifford L. Jackson, declarant and Pro Per., have made an emotional decision, where-upon intellect was needed in regards to acting in ones [*sic*] behalf as self representing attorney."

"litigate. I am going to sit down and let you do what you have to do then." The court responded that how defendant handled the trial was "entirely up to you." Defendant answered, "I am not going to do something but sit down here and let you conduct the lynches." The court cautioned defendant to be careful in selecting words to describe the trial as "[i]t is not going to serve you well" to which defendant responded, "I am looking at life." The court ordered a recess.

When the proceedings resumed, the judge started explaining the procedure to be followed during trial. An attorney appeared to speak to defendant and the court granted a recess for that purpose. Afterward, however, the attorney was not present. The court told defendant that if the attorney decided to represent him, the attorney was to make a general appearance on Friday morning before the start of jury selection to seek a continuance. On Friday morning, no attorney was present, however defendant's written motion to withdraw as propria persona attorney was delivered to the court. It was denied as untimely.

Defendant then refused to remain in the courtroom. The court granted his request "to be left in the cell." The court noted for the record that defendant was informed that the proceedings in the courtroom could be transmitted to the holding cell. Defendant responded, "I don't want to hear nothing." In a declaration under penalty of perjury submitted with the petition for a writ of habeas corpus, defendant stated that at his request, the loudspeaker in the holding cell was turned off. Jury selection started immediately. The jury was selected and four witnesses testified in defendant's absence: the Seaside police department records supervisor who filled out the sex registration card with defendant in October 1997, the personnel manager for Fox Integrated Technology who testified that defendant's employment application listed a San Jose address, the maintenance supervisor at the San Jose address which was defendant's girlfriend's apartment, who saw defendant leave her apartment just about every morning and come home just about every evening for about six months at the end of 1997 and the beginning of 1998, and Officer McMillin who arrested defendant and testified to finding the sex registration card with the Seaside address.

Defendant decided to attend the balance of the trial, and appeared on the next court day, Monday morning. He was told he could not cross-examine the witnesses who testified on Friday because "[t]hey are gone." Defendant, who had requested to wear civilian clothes, was wearing jail clothes and leg chains and a waist chain. The jail apparently lost his civilian clothes. The jail offered to dress him in a black sweatshirt, red sweatpants and white tennis shoes, but he refused, complaining, "Those things haven't even been

washed." The court also offered to have the chains removed, but when defendant said he would have "no comment on that," the court told him that if he wanted the chains off he would have to ask. Defendant responded, "I am not going to ask you for nothing." Defendant wore jail clothes and the chains throughout the trial.

Defendant did not testify but presented five documents to the jury: a state income tax refund check with the Seaside address, a Fox Integrated Technology paycheck envelope, payroll registers for April 10 and 24 of 1998, and defendant's W-2 form for 1998 showing the Seaside address. Defendant gave his version of the facts, over constant objections that the information he was disclosing was not in evidence and in spite of the judge's admonitions to him and the jury, during closing argument. Defendant stated that he had used his girlfriend's address on the job application to increase his chances of being hired, but that he lived in Seaside and commuted to work. He stated he stayed overnight at his girlfriend's apartment two nights a week, but never stayed at his girlfriend's apartment five straight days. Defendant stated that "Santa Clara County solicited Monterey County" to file similar charges, but it refused, and that he would "get 25 to life" because of the prior convictions although he already "did the time for those crimes." The jury convicted defendant of count 1, failure to register in San Jose and found true the five strike priors. The public defender was appointed to represent defendant at sentencing. His motion for a new trial and his *Romero* motion[5] to strike the priors were denied and he was sentenced to 25 years to life in state prison. This appeal ensued.

### CONTENTIONS ON APPEAL

Defendant asserts (1) his conviction violated due process and ex post facto principles because he had no actual notice or actual knowledge that he was required to register at two addresses; that provision was not incorporated into section 290 until after his trial. (2) The trial court misinstructed the jury on issues of notice, knowledge, intent, and residence. (3) The evidence was insufficient to support the verdict. (4) The prosecution violated *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] by withholding from the defense critical exculpatory evidence from a key prosecution witness that defendant, in fact, resided in Seaside and had only listed the San Jose address on his employment application to improve his chances of getting the job; and (5) the trial court violated defendant's right to counsel, to present a defense, and to a fair trial by denying his repeated requests for advisory, retained, or appointed counsel, and by denying him an investigator and other tools necessary to prepare for trial.

---

[5] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628].

NOTICE

Defendant claims that the law he was convicted of violating—"failure to register a *residence* address—did not even become criminal until three months before [defendant] was arrested [on April 13, 1998]. [Section 290, subdivision (a)(1) (hereafter section 290(a)(1)), in effect in October 1997, informed a sex offender to register in the city in which he or she was 'domiciled.' It was changed by Statutes 1997, chapter 821, section 3.5.] Even more to the point, the requirement of registering a *second* residence address did not become effective until *after* [defendant]'s [August 1999] conviction. [Effective January 1, 2000, section 290(a)(1)(B) required sex offenders to register more than one residence or location at which they regularly reside or are located. (Stats. 1999, ch. 576, § 1.)] [Defendant] was notified in October 1997 of the gravamen of the offense as it then existed, namely that he must register in the city or county in which he was '*domiciled.*' " (Original italics.) Before January 1, 2000, section 290 contained no explicit "provision for the registration of *two* residences,[6] and included only one ambiguous reference to the need to register where one 'temporarily' resides." (Original italics.) Defendant contends that he reasonably believed he was in compliance with the registration requirements as they existed in 1997 and that he was never given notice by the state that he was required to register two residence addresses.

On October 23, 1997, when defendant filled out the "Registration Change of Address/Annual Update" form with the Seaside police department, he initialed the following statements: "My responsibility to register is a lifetime requirement. [¶] Upon coming into any city, county, or city and county in which I am domiciled, I must register with the law enforcement agency having jurisdiction over my residence . . . as a sex offender, within five (5) working days. [¶] When changing my residence, I must inform the registering agency whose jurisdiction I am leaving, . . . as a sex offender, within five (5) working days."[7] Defendant argues that telling him that he must register within five days of obtaining a new " '*domicile,*' and that he must report a '*change*' of address" did not constitute "notice of the duty to register

---

[6]The November 1998 case of *People v. Horn* (1998) 68 Cal.App.4th 408, 417-419 [80 Cal.Rptr.2d 310] held that section 290 registrants were required to register an additional place of residence if they had one even though the statute did not so expressly state. However, the issue raised here is the same as in *People v. Edgar* (2002) 104 Cal.App.4th 210, 220, footnote 11 [127 Cal.Rptr.2d 662] (*Edgar*), which found *Horn* not dispositive because Edgar "raise[d] the distinct question of whether he had the requisite actual knowledge that adding a second residence constituted a 'change' of residence for purposes of section 290's registration requirement."

[7]The remaining advisements relate to annual updating, use of community care facilities, and name change, none of which are pertinent to the issues before the court.

*two* addresses." (Original italics.) "Without such notice he could not have 'willfully' failed to register and could not lawfully be convicted of violating section 290." Defendant argues that "[t]he concept of 'domicile' . . . admits of only *one* domicile at a time. Similarly, telling a registrant that he must report a 'change' of residence cannot consistently with due process be considered notice of a duty to report the acquisition of a *second* residence while continuing to maintain the first. 'Change' connotes substituting one for another. . . . In fact, the notice [defendant] received on this registration requirement was that, if he changed his residence, he must 'inform the registering agency *whose jurisdiction [he was] leaving* . . . within five working days.' " (Original italics.)

Defendant contends that the notification he received from the Seaside police of the registration requirement gave him no notice of an obligation to register a second residence. He further contends that neither the complaint nor the information notified him that he was being charged with having two residences and failing to register one of them.[8] Finally, there was no showing that he had actual knowledge of his obligation to register a second, temporary residence (assuming, arguendo, that the girlfriend's San Jose address was a second, temporary residence).

Nevertheless, defendant was prosecuted for a continuing violation of the registration statutes from June 1997 when he came to San Jose to April 1998 when he was arrested. (See *Wright v. Superior Court* (1997) 15 Cal.4th 521, 526-527 [63 Cal.Rptr.2d 322, 936 P.2d 101].) The jury was instructed that "each of the following elements must be proved: One, the defendant is a person who having been previously convicted of rape in violation of Penal Code Section 261, is required to register as a sexual offender pursuant to Penal Code Section 290; and two, such person changed his residence address; and three, such person willfully failed to inform in writing within five days, the law enforcement agency or agencies with whom he last registered of any change of residence address. [¶] In this case, if you find that this defendant was previously convicted of rape . . . you must accept, as a matter of law, the defendant is required to register pursuant to [section 290]. No further proof of this fact is required. You must accept as true the existence of this fact."

The jury retired at 2:03 p.m. Fifteen minutes later it asked for a copy of the instructions, and less than an hour after it retired, it asked for a readback

---

[8]Count 1 of the information charged that defendant failed to register with the chief of police of the city in which he temporarily resided, and if he had no residence, was located, namely the City of San Jose. This wording conforms to the 1999 version of section 290. Count 2 charged that defendant failed to inform the Seaside Police Department of his new address.

of certain testimony and for a "clearer definition of willful-intent" and "definition of domicile and residence." To the latter request, the court instructed the jury that the instructions contained the "legal definition of both willful [CALJIC No. 1.20] and general intent [CALJIC No. 3.30]" which the jury had to follow. Then, in language approved in *People v. Horn, supra,* 68 Cal.App.4th at pages 414-415, the court instructed: "As used in these instructions the term residence means a temporary or permanent dwelling place, which one keeps and to which one intends to return, as opposed to a place where one rests or shelters during a trip or a transient visit. [¶] Depending upon the circumstances, one may have a single place of residence or more than one place of residence. [¶] One who has one place of residence and then adds a second place of residence has changed his residence within the meaning of this law and has a duty to report this change resulting in an additional residence even though he may also maintain a residence at the old place." Defendant complains that these instructions were clear error. The court not only did not instruct the jury "that it must find that [defendant] had actual *knowledge* of the duty to register a second, temporary residence" (original italics), it did not inform it that "*any form of notice* was required for [defendant] to be subject to criminal conviction for a 'willful' violation of the registration requirement." (Original italics.) "Even worse," defendant continues, "the court instructed the jury that it 'must accept, as a matter of law,' that [defendant] was required to register, that 'no further proof of this fact is required' and that the jury 'must accept as true, the existence of this fact.'"

The California Supreme Court found the CALJIC No. 1.20 willfulness instruction "incomplete in failing clearly to require actual knowledge of the registration requirement." (*People v. Garcia* (2001) 25 Cal.4th 744, 754 [107 Cal.Rptr.2d 355, 23 P.3d 590] (*Garcia*).) █ "In a case like this, involving a *failure* to act, we believe section 290 requires the defendant to actually know of the duty to act. Both today and under the version applicable to defendant, a sex offender is guilty of a felony only if he 'willfully violates' the registration or notification provisions of section 290. [Citations.] The word 'willfully' implies a 'purpose or willingness' to make the omission. [Citation.] Logically one cannot purposefully fail to perform an act without knowing what act is required to be performed. . . . 'Consistent with that requirement, and in appropriate cases, knowledge has been held to be a concomitant of willfulness. [Fn. omitted.]' Accordingly, a violation of section 290 requires actual knowledge of the duty to register. A jury may infer knowledge from notice, but notice alone does not necessarily satisfy the willfulness requirement." (*Id.* at p. 752.)

"Furthermore, like the ' "ignorance of the law is no excuse" ' instruction (CALJIC No. 4.36) given in *Garcia,* the general intent instruction given here

(CALJIC No. 3.30) 'on its face would allow the jury to convict [defendant] of failing to register even if he were unaware of his obligation to do so.' [Citation.] We therefore find that the instructions given in this case also were erroneous in that they failed to clearly state that a conviction required actual knowledge of the duty to register. [Citation.]" (*Edgar, supra,* 104 Cal.App.4th at p. 219.)

 In our case, the existence and sufficiency of notice is a factual question which should have been decided by the jury. (*Society of Cal. Pioneers v. Baker* (1996) 43 Cal.App.4th 774, 786 [50 Cal.Rptr.2d 865].) There was no instruction that the jury could not convict unless defendant actually knew of the registration requirement and, since during the time period applicable to this case, former section 290 did not address the issue of multiple residences, there was no instruction that there must be evidence that defendant actually knew that he was required to register additional addresses. (*Edgar, supra,* 104 Cal.App.4th at p. 220.)

These errors are not harmless beyond a reasonable doubt. Although there was strong evidence that defendant actually knew of the 1997 version of the registration requirement which told him to register when he came into a city where he was domiciled and to notify the law enforcement agency when he changed his address, there was no evidence that he knew he was required to register additional addresses. That was a rule articulated for the first time in 1998, after defendant's arrest, by *People v. Horn, supra,* 68 Cal.App.4th 408, and codified in 1999 to become effective on January 1, 2000. There was no doubt from the record that defendant was contesting that he had a second residence address which he knew he had to register. Because of defendant's trial tactics, the only evidence that the Seaside address was his residence was the documentary evidence that the Department of Motor Vehicles and his employer had that address for important documents—his paychecks, tax information, and driver's license. This evidence, along with defendant's objectionable closing argument, establishes, however, that he was contesting these points during the trial. A trial court's failure to instruct the jury on an element of the crime requires reversal when "the defendant contested the omitted element and raised evidence sufficient to support a contrary finding . . . ." (*Neder v. United States* (1999) 527 U.S. 1, 19 [119 S.Ct. 1827, 1838, 144 L.Ed.2d 35].) The error is not prejudicial when on appeal it is clear "beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence . . . ." (*Id.* at p. 17 [119 S.Ct. at p. 1830].) Because in our case there was no evidence of defendant's actual knowledge that he knew he was required to register additional addresses, the conviction must be reversed.

## DISPOSITION

The judgment is reversed.

Rushing, P. J., and Elia, J., concurred.