Filed 10/2/13  P. v. Villagran CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

<table>
<tr><td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWIN ORLANDO QUIR VILLAGRAN,<br><br>    Defendant and Appellant.</td><td>E054899<br><br>(Super.Ct.No. RIF10005509)<br><br>OPINION</td></tr>
</table>

APPEAL from the Superior Court of Riverside County.  Eric G. Helgesen, Judge. (Retired Judge of the former Tulare Mun. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part with directions.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Meagan J. Beal, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Edwin Orlando Quir Villagran[1] appeals after he was convicted of various offenses arising out of sexual abuse of three victims. He contends that the trial court should have stayed punishment on some of the counts under Penal Code section 654, which prohibits multiple punishments for the same act. Defendant also challenges his conviction for possession of child pornography as time-barred. He seeks a reduction of the sex offender fees based on the provisions in effect at the time he committed his crimes, as well as a modification of the no-visitation order imposed by the court.

We modify the sex offender fine, and remand with directions to hold further proceedings with respect to omitted mandatory penalty fees, and with respect to the no-visitation order entered by the court. Otherwise, we affirm the judgment.

<u>FACTS AND PROCEDURAL HISTORY</u>

Gloria Gomez was the mother of the three victims in this case. The oldest child, Jane Doe 2, was born before defendant married Gomez, but Doe 2 was very young when they married, and defendant and Gomez always led Doe 2 to believe that defendant was her biological father. After the marriage, two more daughters were born. Jane Doe 1 was about five years younger than Doe 2, and Jane Doe 3 was about eight years younger than Doe 2. Defendant is the biological father of Doe 1 and Doe 3.

Defendant was a strict disciplinarian who attempted to exercise complete control over all three children. Defendant told them when to get up, when to go to bed, when

---

[1] Defendant is referred to as Edwin Orlando Quir Villagran, Edwin Orlando Quiroa Villagran, Edwin Villagran and Edwin Orlando Quiroa.

2

they could watch television, when they could eat, and when and where they could go. The three girls were not allowed to have friends visit in their home. Defendant made all the rules and controlled everything in the home. Defendant was very intimidating.

1. Crimes Relating to Doe 2

Doe 2, the oldest child, was about five years old when defendant began molesting her. Defendant would typically do this when he was at home, but Gomez was at work. The incidents occurred at various places where the family lived in Los Angeles County. The first incident that Doe 2 could recall took place, as noted, when she was about five years old. Defendant turned on a pornography video, and told Doe 2 to lie on the floor. Defendant touched Doe 2 in the genital area, and put his fingers in her vagina. This was painful for Doe 2. She cried and told defendant to stop, but he did not stop. Defendant did this to Doe 2 on more than one occasion. He told Doe 2 that it was their secret, and she should not tell anyone. When she got older, and her sisters had been born, defendant warned her that if she told anyone, he would do the same thing to her sisters. Doe 2 was afraid of defendant, and she did not want to cause problems in the family, so for the most part she kept quiet. She also wanted to protect her sisters.

On one occasion, however, when defendant was not able to provide childcare, another babysitter took care of the children. Doe 2 was about six years old. She told the babysitter that defendant was hurting her. The police began an investigation; Doe 2 told the officers that defendant had touched her vagina more than once. Doctors and therapists were unable to confirm the abuse with other evidence, so defendant was not prosecuted at that time. Defendant spanked Doe 2, called her a liar, and said that her

mother would not believe her.  Defendant continued to molest Doe 2 after that, but Doe 2 thought that no one would believe her if she said anything, so she did not make any further reports of abuse.

The court admitted evidence of some uncharged acts to show propensity.  When Doe 2 was approximately nine years old, her aunt took her to live in Guatemala for about one year.  Defendant visited Doe 2 in Guatemala for a few weeks.  Approximately four different times during this period, defendant took off his clothes, got into bed with Doe 2, and touched both himself and her vagina.  The jury was instructed that it could not convict defendant for any acts that took place outside the United States.

Doe 2 moved back with the family in Inglewood, in Los Angeles County, in 1996 or 1997, when she was nine or 10 years old.  Defendant resumed the molestations. Defendant would show Doe 2 pornographic films, while he masturbated himself and put his fingers into her vagina.  Defendant did this numerous times; Doe 2 estimated it happened more than 20 times.  Defendant would also have Doe 2 rub his penis; he told her that he was teaching her "how [she] was supposed to be with a man."  Doe 2 was still afraid of defendant.  She felt scared, as if she could never get away.

Doe 2 recounted one incident when she was nine or 10 years old, when defendant took her with him while he visited friends in Los Angeles.  On the way home, defendant drove to a dark street and parked his car.  He told Doe 2 to get into the backseat and to take off her clothes.  Defendant also took off his clothes and got on top of Doe 2.  He had intercourse with her, inserting his penis into her vagina.  This was so painful for Doe 2 that she passed out. When she woke up, she was bleeding from her vagina.  She cried,

but defendant told her she would get used to it. He also repeated his threat to Doe 2, not to say anything about the abuse, or he would do the same thing to her sisters.

Defendant continued to rape Doe 2 when she was 11 years old, inserting his penis into her vagina. Defendant did this more than 20 times while Doe 2 was 11 years old. He would have sexual intercourse with Doe 2 whenever Gomez was not around.

Whenever defendant told Gomez that he was going to visit friends, Doe 2 was frightened because she knew he would take her along and rape her in the car. Doe 2 believed she could not stop the attacks because nothing happened the first time she reported the abuse. Whenever she cried or told defendant she did not want to do it anymore, defendant told her that she had to do it and learn to like it; if not, it would happen to her sisters.

When Doe 2 was between the ages of 11 and 13 (from about 1998 to 2000), defendant would often place his fingers in Doe 2's vagina. He would take advantage of every opportunity when Gomez was not present. These digital penetrations happened more than 20 times. During the same period, defendant also did other acts of sexual abuse. Doe 2 estimated that, between five and 10 times, defendant made her put his penis into her mouth. She gagged and choked, and would start to vomit. Defendant became angry and belittled Doe 2, telling her that she could not do anything. Defendant also put his mouth on Doe 2's vagina, approximately 10 times.

Defendant also took videotapes of himself having sex with Doe 2. He did this about 15 times. Doe 2 would lie still, hoping her ordeal would be over quickly. Defendant became angry and ordered Doe 2 to act like the women in the pornography

videos. He wanted her to kiss him and act like she enjoyed the activity. He told her to moan. He complained that she was like a "dead fish."

The rapes caused Doe 2 to become pregnant when she was 13 years old. Defendant noticed that Doe 2 often felt sick and was throwing up. He suspected she was pregnant and had her take a home pregnancy test. At first, defendant told Doe 2 that she had to carry the pregnancy, and that Doe 2 should tell her mother that a boy at school had gotten her pregnant. Defendant later changed his mind and told Doe 2 that she must have an abortion. Defendant took Doe 2 to a clinic to get an abortion. Doe 2 had to walk through a crowd of protesters calling her a "baby killer."

The last time defendant raped Doe 2 was the day before the abortion. After the abortion, defendant did not have intercourse with Doe 2 again, but he continued to fondle her, rubbing her breasts and buttocks, and rubbing her vagina or putting his fingers into her vagina. Defendant continued with this conduct until Doe 2 finally left home at the age of 19 or 20.

Defendant had threatened that, if Doe 2 did not cooperate or if she told anyone, defendant would molest her little sisters. Doe 2 complied with defendant's demands, in part because she was afraid of him, in part because she believed he was her biological father and that she was obliged to obey him, and in part to protect her sisters. Unfortunately, Doe 2's sacrifice was not wholly successful, because, although defendant did not rape her sisters, he did subject them to multiple acts of sexual molestation.

6

2. Crimes Relating to Doe 1

Defendant started molesting Jane Doe 1, the middle sister, when she was about five years old. He had started molesting Doe 2 when she was approximately the same age. Defendant groped Doe 1's breast area under her clothes. She was confused and scared. Doe 1 tried to push defendant away, but defendant did not stop. This happened more than five times when Doe 1 was five years old. Doe 2 saw defendant touch Doe 1 in the breast area more than 10 times while they were living in Los Angeles County, when Doe 2 was about age 13.

When Doe 1 was about seven years old, in 1999 to 2000, defendant would often touch her breasts, skin-to-skin. This happened more than 10 times. Doe 1 was scared and angry. Defendant also touched her vaginal area. He would put his hand under her clothing and grab or rub her vagina. He also put his fingers inside her. This was painful for Doe 1. She told defendant that he was hurting her, but he laughed and did not stop. Every time defendant would do this to her, Doe 1 told defendant to stop, but he never stopped. The acts of digital penetration took place more than 20 times when Doe 1 was seven years old. The acts of grabbing and rubbing Doe 1's vagina, without digital penetration, happened more than 10 times when Doe 1 was seven years old. Doe 1 felt angry, scared, and helpless.

When Doe 1 was older, approximately ages eight through 11, defendant continued the molestations. Defendant would frequently touch Doe 1's breasts. This happened more than 10 times during that period. He put his fingers in her vagina more than 50 times. Doe 1 told defendant to stop and tried to push him away, but he would not stop.

The digital penetrations continued to hurt, but were not as painful as when Doe 1 was seven. Defendant also rubbed Doe 1's vagina without inserting his fingers more than 10 times.

Once, when Doe 1 was 11 years old, defendant videotaped himself performing sexual acts on Doe 1. Defendant had a video camera in his hand when he told Doe 1 to come into his bedroom. She did not want to go, but he pushed her a little. He placed the camera by the dresser and started touching her vaginal area over her clothes. He put his hand inside her pants and underwear and inserted his finger in her vagina. Defendant pushed Doe 1 onto the bed, pulled up her shirt and pulled her pants and underwear down to her ankles. He lay on top of her, pinning her on the bed with his weight. Doe 1 asked defendant to stop, but he continued what he was doing and told her to be quiet. He said he would give her $10 if she would let him do whatever he wanted. Doe 1 felt angry, scared, and hurt, but did not say anything after that. Defendant pulled out his penis and rubbed it against her vagina, without penetrating her, for a long time. The episode ended when defendant heard the youngest girl in the shower. Then Doe 1 started to cry. Defendant told her to stop crying. Doe 1 went to her room, crying. Defendant came in and gave her $5. He told her to stop crying because her mother would be home soon.

When Doe 1 was ages 12 and 13, defendant would often grab her breasts and rub or touch her vagina. This happened more than 20 times. When Doe 1 was about age 13, the family moved to Riverside County. Defendant stopped molesting Doe 1 when she was about 14 or 15, while they lived in Riverside County.

3.  Crimes Relating to Doe 3

Defendant did not start molesting Jane Doe 3, the youngest child, until she was about age 13, while the family was living in Riverside County.  Early one morning, Doe 3 was watching television before most of her family members were awake.  As she was sitting on the couch, defendant came and sat next to her.  He touched her over her clothes, and rubbed her leg for several minutes.  Then he put his hand inside her pants and underwear, and started rubbing her vagina.  He put his finger inside her.  Doe 3 told defendant to stop and tried to push his hand away, but he was stronger than she was and did not stop.  Defendant told Doe 3 to stop complaining and to shut up before her mother heard her.  Doe 3 was too frightened to call for help.  Defendant stopped only when he heard Gomez getting up in the next room.  Defendant told Doe 3 not to tell anyone.

Later the same year, defendant called Doe 3 into his bedroom.  He had the television on and told her to sit next to him on the bed.  He put his hand inside her shirt and rubbed her breast in a circular motion, over her bra, for more than a minute.  Doe 3 told defendant to stop, but he did not stop.  Defendant offered her money if she would let him put his hand down her pants again.  She refused.  Defendant tried to put his hand inside her pants again, but Doe 3 kept pushing his hand away.  He managed to place his hand inside her pants, but she prevented him from reaching inside her underwear.  Doe 3 could not get away because defendant had his arm around her, and his leg was on top of her leg.

Several times, while Doe 3 was 13 years old, defendant would come into her room, lie next to her, and rub her breasts.  This happened more than five times.  One

9

time, while touching her breasts, he pulled down her shirt and bra strap and bit her breast. Doe 3 told defendant to stop. He just laughed, replaced her clothing, and left the room.

Sometime in 2008 or 2009, Doe 1 was using defendant's cell phone, and discovered some suggestive photographs of Doe 2 saved on defendant's phone. When Doe 1 told Doe 2 what she had found, the three sisters for the first time discovered that defendant had been molesting all three of them. This prompted the three sisters to talk about the incidents, and they then told their mother. They were afraid to go to the police at that time. After Gomez learned of the molestations, however, she told defendant to leave. She took her daughters and moved away without leaving a forwarding address.

Although the family moved and tried to get away from defendant, Doe 2 would sometimes see defendant's car on the freeway. Doe 1 reported the abuse to someone at her school in 2010, and the school notified police. Defendant was no longer living in the household.

The investigating officers recovered videotapes from defendant's residence. Some of the videos depicted defendant engaged in sexual activity with Doe 2. Doe 2 appeared to be different ages in some of the videos. During his police interview, defendant admitted having sex with Doe 2. He claimed that she was over age 14 when this happened. He also claimed that Doe 2 had initiated the sexual contact, because she allegedly wanted to know what it felt like to have sex. Defendant claimed he had had sex

10

with Doe 2 only approximately seven times. Defendant denied all other sexual abuse of the three children.

After police investigated, defendant was charged in a second amended information with 22 counts, as follows:

Crimes against Doe 1:

Six counts of commission of a lewd act on a child under the age of 14, taking place in 1997 (count 1, count 2), in 1999-2000 (count 4, count 6), and in 1999-2003 (count 8, count 10) (Pen. Code, § 288, subd. (a)). Four counts of aggravated sexual assault, consisting of sexual penetration by force, committed on a child under age 14, and 10 or more years younger than defendant, taking place in 1999-2000 (count 3, count 5), and 1999-2003 (count 7, count 9) (Pen. Code, §§ 269, subd. (a)(5), 289, subd. (a)).

Crimes against Doe 3:

Taking place in and about 2008, two counts of commission of a lewd act on a child under age 14 (count 11, count 13) (Pen. Code, § 288, subd. (a)), and one count of aggravated sexual assault, consisting of sexual penetration by force, and committed on a child under age 14, and 10 or more years younger than defendant (count 12) (Pen. Code, §§ 269, subd. (a)(5), 289, subd. (a)).

Crimes against Doe 2:

Four counts of commission of a lewd act on a child under age 14, taking place between 1997-2000 (count 15, count 17, count 19, count 21) (Pen. Code, § 288, subd. (a)), and four counts of aggravated sexual assault on a child under age 14, and 10 or more years younger than defendant, by means of rape, taking place from

11

1997-2000 (count 14, count 16, count 18, count 20) (Pen. Code, §§ 269, subd. (a)(1), 261, subd. (a)(2)).

Defendant was also charged in count 22 with a separate offense of possession of child pornography (Pen. Code, § 311.11, subd. (a)).

The second amended information also alleged in connection with all the offenses that defendant had committed lewd acts against more than one victim (Pen. Code, § 667.61, subd. (e)(5)).

The evidence presented at trial was as described above. Defendant also testified on his own behalf at trial. He asserted that Doe 2 was curious about sex, and had asked defendant about intercourse. Defendant had offered to have sex with her so she could experience it. Initially, Doe 2 declined, but then she decided she wanted to have sex with defendant. Defendant maintained that he never forced Doe 2 to have sex with him. Defendant denied any sexual contact with Doe 1 or Doe 3. Defendant admitted that three videotapes depicted him having sex with Doe 2; he also admitted he was sexually aroused when having sex with her.

Defendant was partially impeached with his police statement.

The jury found defendant guilty of all charges, and found true the allegations that defendant had committed sex crimes against multiple victims.

The court sentenced defendant on October 28, 2011, to a total indeterminate term of 150 years to life, plus a total consecutive determinate term of 30 years, 8 months.

Defendant filed a notice of appeal on November 2, 2011.

12

ANALYSIS

I. Sentences Were Properly Imposed on Both the Counts Alleged as Lewd Acts and the Counts Charged as Aggravated Sexual Assaults

At sentencing, defendant's counsel argued that Penal Code section 654 should be applied to stay sentencing on all of the convictions of lewd and lascivious acts (Pen. Code, § 288), because the jury might have returned guilty verdicts on those counts based on the same conduct underlying the convictions of aggravated sexual assault and rape (Pen. Code, § 269, subds. (a)(1) & (a)(5)).  "[T]he way that the 288's were pled, given the fact that they . . . covered substantially the same time period . . . I think that it's unclear if the jury, by its verdict, felt that the same conduct was covered under the counts, and therefore, I think the Court should find that the 288's were 654 [i.e., should be stayed under Penal Code section 654] to the other counts, the 269(a)(5)'s and the 269(a)(1)'s."

The prosecutor responded that there was "ample evidence to sustain convictions for actually many more crimes than what we charged."  In addition, the prosecutor had, in closing argument, "specified that there was a difference in that we were asking for convictions based on conduct outside the rapes or the digital penetration in reference to the 288(a)'s.  And I don't think there is any reason to believe that the jury returned the verdicts otherwise."

The court recalled that it had been "pointed out to the jury in argument, that in fact the 288(a)'s were separate and apart from the 269's."  The court did agree that "the counts were charged what we refer to as generically," but that had been done because "[t]his act happened many times over a period of time.  And the testimony was that they

13

happened many more times than the number of charges there were, certainly." The court therefore found that Penal Code section 654 did not apply.

Here, defendant renews the contention, arguing that, "By charging [defendant] with the commission of a lewd and lascivious act and aggravated sexual assault of the same victims within the same time period, and not requesting a special verdict, the prosecution opened the door to a juror using the same act as proof of both crimes." Defendant claims that this case "presents this Court with the legal issue of whether the prosecutor's argument, together with evidence of more acts than were charged, controls a section 654 determination."

Defendant has mischaracterized the issue. The issue is not whether a prosecutor's argument, together with evidence of multiple acts (more than were charged) "controls a section 654 determination." Rather, the question is whether the trial court, in making a determination whether Penal Code section 654 applies, is foreclosed from considering the evidence adduced at trial, together with the arguments, to make a finding not expressly made by the jury.

That question has been answered contrary to defendant's assertion here. In *People v. McCoy* (2012) 208 Cal.App.4th 1333 (*McCoy*), the defendant was convicted of burglary, sexual assault, and violating a restraining order, when he went to the victim's residence, broke in, and sexually assaulted her. The defendant contended that, because of the way the offenses were charged, there was no jury finding that the violation of the restraining order occurred on a separate occasion from the other crimes. The trial court imposed punishment for the violation of the restraining order, as well as for the other

14

crimes, despite Penal Code section 654; the evidence suggested that defendant may have made more than one entry into the victim's residence, and either entry would support a conviction of violation of the restraining order. Defendant objected that, because there was no *jury* finding for which entry was the basis for the conviction of violating a protective order (or, indeed, whether there had actually been more than one entry), the trial court could not make an independent finding that there was a separate entry upon which to base separate punishment—i.e., that Penal Code section 654 did not apply.

The *McCoy* court held that a trial court in its sentencing discretion may base its decision on *any* facts that are in evidence at trial, without regard to the verdicts, unless some circumstance in those verdicts forecloses the trial court from doing so. In *People v. Siko* (1988) 45 Cal.3d 820, for example, both the charging document and the verdicts had specified two particular sex offenses as the basis for generic charges of lewd and lascivious conduct. Neither the closing argument nor the instructions had suggested any other basis for the molestation counts. (*Id*. at p. 826.) "*Siko* is thus authority that where there *is* a basis for identifying the specific factual basis for a verdict, a trial court cannot find otherwise in applying section 654." (*McCoy*, *supra*, 208 Cal.App.4th 1333, 1339.)

Where there is not a basis for identifying the specific factual basis for a verdict, however, the trial court is not foreclosed from considering all the available evidence in making its decision under Penal Code section 654. The *McCoy* court analyzed additional cases:

"The defendant in *People v. Centers* (1999) 73 Cal.App.4th 84 [86 Cal.Rptr.2d 151] entered a house with a gun. Three people were inside. He kidnapped one of them.

15

The jury convicted him inter alia of kidnapping, and of a single count of burglary with a firearm use enhancement. [Citation.] *Centers* noted that neither the information nor the verdicts specified a particular victim of the burglary and its firearm use enhancement. [Citation.] In that circumstance, 'the trial court is entitled to make any necessary factual findings *not already made by the jury*' . . . and thus 'could properly find multiple victims' (a finding for which there was substantial evidence) and impose punishment for the burglary and enhancement in connection with one of the occupants of the apartment as well as the kidnapping of the other [citation].

"*People v. Bradley* (2003) 111 Cal.App.4th 765 [4 Cal.Rptr.3d 166] and *People v. Nguyen* (1988) 204 Cal.App.3d 181 [251 Cal.Rptr. 40] both dealt with punishment of an accomplice for a robbery and an attempted murder in the course of the robbery. In *Nguyen*, the accomplice not only aided the commission of the robbery but also abetted the shooting of the victim (shouting words of encouragement). Because the verdicts 'in no manner *foreclosed*' the conclusion that the accomplice had developed an independent purpose of shooting the victim, which the evidence supported, it was proper for the trial court to impose sentence on both convictions. (*Nguyen*, at pp. 189-190, italics added.) In *Bradley*, however, the shooting was prosecuted solely as a natural and probable consequence of the robbery (the only crime the accomplice apparently intended); given the theory of the instructions underlying the verdict and the absence of substantial evidence of an independent purpose, the trial court could not properly impose sentence on both under section 654. (*Bradley*, *supra*, 111 Cal.App.4th at pp. 767, 769-770, 772 [on this basis distinguishing *Nguyen* ].)

16

"The gist of these cases . . . is that in the absence of some circumstance 'foreclosing' its sentencing discretion (as in *Siko* and *Bradley* ), a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial, without regard to the verdicts." (*McCoy*, *supra*, 208 Cal.App.4th 1333, 1339-1340.)

Here, there was nothing in the manner in which the case was charged and tried, or the jury instructed, or in the arguments of counsel, which foreclosed the trial court from considering all the evidence adduced at trial in making its sentencing decision under Penal Code section 654. The evidence here showed substantial evidence of multiple acts of molestation (lewd and lascivious conduct) in addition to the charges of aggravated sexual assault and rape.

" 'The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability.' [Citation.]" (*People v. Valli* (2010) 187 Cal.App.4th 786, 794.) Here, defendant committed many more offenses than he was either charged with or convicted of. By no stretch of the imagination will the imposition of punishment on both the lewd and lascivious counts and the aggravated sexual assault and rape counts result in punishment incommensurate with defendant's criminal liability. The trial court did not err in failing to stay the sentences on the lewd and lascivious conduct convictions under Penal Code section 654.

II. <u>The Statute of Limitations Did Not Bar the Child Pornography Conviction</u>

Defendant contends that his prosecution for possession of child pornography as charged in count 22 was time-barred. The information alleged that defendant had committed the offense over a period of years, ranging from 1997 to and including 2010.

The proper statute of limitations for violation of Penal Code section 311.11 (possession of child pornography) is three years. Defendant claims that, because the range of years included in the charging document included some time that was greater than three years before the complaint was filed, the prosecution for child pornography was time-barred.

The contention is without merit. Possession of child pornography is a continuing offense: "Some crimes . . . are not terminated by a single act or circumstance but are committed as long as the proscribed conduct continues." (*Wright v. Superior Court* (1997) 15 Cal.4th 521, 525.) The California Supreme Court, in an analogous context, stated that, "Drug possession is indeed a 'continuing' offense, one that extends through time. Thus, throughout the entire time the defendant asserts dominion and control over illegal drugs, the defendant is criminally liable for the drug possession." (*People v. Bland* (1995) 10 Cal.4th 991, 999.) By parity of reasoning, defendant's possession of child pornography is a continuing offense, which persists throughout the entire time that defendant had dominion and control over the pornographic videos he had taken of his sex acts against the children. The crimes did not come to light until 2010. A search warrant was executed on defendant's residence in 2010, and the video recordings were seized at that time. Defendant possessed all the pornographic materials up until the time they were seized. His possession ended at that time, and the statute of limitations then began to run. Defendant was prosecuted within three years of the time the crime of possession was completed, in approximately October or November 2010. The prosecution for possession of child pornography was timely.

III.  The Judgment Should Be Modified with Respect to the Sex Offender Fines Under Penal Code Section 290.3

Defendant next contends that the sex offender fine imposed by the court pursuant to Penal Code section 290.3 should be reduced, because the statutory fine amount was lower at the time that defendant committed the bulk of his crimes.  He further urges that the statute should be interpreted to require that only one sex offender fine be imposed in a single prosecution, regardless of the number of counts charged and convicted.

In 1995, the Legislature enacted a new fine provision applicable to specified sex offenses.  The original version of the statute imposed a fine of $200 for the first conviction, and $300 for the second and each subsequent conviction.  (Pen. Code, § 290.3 as amended by Stats. 1995, ch. 91, § 121, pp. 346-347.)  The statute was amended to increase the fine to $300 for the first conviction, and $500 for second and subsequent convictions.  (*Id*., as amended by Stats. 2006, ch. 337, § 18.)  The amendment became effective on September 20, 2006.

Defendant committed most of the charged crimes before 2004.  He committed the crimes against Doe 3 (counts 11, 12 and 13) in 2008, and the continuing offense of possession of child pornography up through 2010.  Because most of his crimes were committed before the effective date of the amendment, the People concede that the sex offense fines should be reduced in 18 of the counts.  That is, a fine of $200 may be imposed on whichever count is the earliest in time (deemed the "first conviction"), plus $5,100, or $300 for each of the remaining 17 pre-2006 counts, as the maximum applicable fine for second-and-subsequent convictions.  All four of the post-2006

19

convictions are second-and-subsequent convictions for purposes of imposing current sex offender fines; $500 each for the four post-2006 convictions is an additional $2,000 in sex offense fines. The total sex offense fine amounts to $7,300.

Defendant counters that only one sex offense fine should be imposed, because there is a single judgment, rather than 22 fines for each of the 22 separate offenses. Defendant posits that Penal Code section 290.3 does not contemplate or authorize multiple fines in a single judgment; the provision for a fine for a "first conviction," and an increased fine for a "second and each subsequent conviction," should logically refer to the timing of the convictions. All current counts are included in a single judgment, so that none of them can be regarded as a "subsequent" conviction to any conviction in the current judgment.

As defendant acknowledges, however, other courts have decided the issue otherwise. (*People v. O'Neal* (2004) 122 Cal.App.4th 817, 822, review den. Jan. 12, 2005; see also, *People v. Walz* (2008) 160 Cal.App.4th 1364, 1370-1371.) The statute provides for the imposition of a fine for each "conviction," not for each "prosecution" or each "proceeding." As we have calculated, the judgment is modified to impose sex offender fees in the amount of $7,300.

The People append an additional aspect to this issue: defendant should be ordered to pay certain additional mandatory penalty assessments that were not imposed by the trial court. The trial court did order court operations assessments of $40 per count (Pen. Code, § 1465.8), and criminal conviction fees of $30 per count for court facilities

funding (Gov. Code, § 70373), but the People object that the court failed to mention or assess criminal justice administration fees (Gov. Code, § 29550.1) or booking fees (Gov. Code, § 29550.2) that should be applicable because defendant was arrested by a local law enforcement officer.

The People further argue that the sex offender fines under Penal Code section 290.3, subdivision (a), are also subject to a state penalty assessment under Penal Code section 1464, subdivision (a), and a county penalty assessment under Government Code section 76000, subdivision (a), to be calculated at $10 (state assessment) and $7 (county assessment) per $10 of the underlying fine ($7,300, as calculated above). In addition, defendant should be liable, as to the four counts that took place in 2008 (three molestation counts as to Doe 3) and 2010 (child pornography possession), for a 20 percent state surcharge (Pen. Code, former § 1465.7, subd. (a), as added by Stats. 2002, ch. 1124, §46), a 30 percent state courthouse construction penalty (Gov. Code, former § 70372, as added by Stats. 2002, ch. 1082, § 4), a 20 percent county emergency medical services penalty (Gov. Code, former § 76000.5, subd. (a)(1), as added by Stats. 2006, ch. 841, §1), a 10 percent penalty to implement DNA collection services (Gov. Code, former § 76104.6, subd. (a)(1), adopted by voters (Nov. 3, 2004), commonly known as Prop. 69 §9), and a 10 percent penalty to finance forensic laboratories (Gov. Code, former § 76104.7, as added by Stats. 2006, ch. 69, §18).

The People argue that the imposition of these omitted penalty fees is mandatory (*People v. Chardon* (1999) 77 Cal.App.4th 205, 216-217), and that the trial court's failure to impose such mandatory fees may be raised for the first time on appeal, and corrected

by the appellate court (*People v. Voit* (2011) 200 Cal.App.4th 1353, 1373). Although appellate courts have approved the practice of trial courts imposing all these penalty assessments by a shorthand reference to "penalty assessments" at sentencing (*People v. Sharret* (2011) 191 Cal.App.4th 859, 864), here the trial court did not make such an oral on-the-record reference. Nevertheless, the People argue, the failure to impose mandatory assessments is a jurisdictional error that may be raised for the first time on appeal, and corrected. (*People v. Stewart* (2004) 117 Cal.App.4th 907, 912.)

Defendant responds with several arguments. First, the trial court's express imposition of some of the fees, and complete failure to mention the others, implies a judicial intention not to impose the omitted penalties. Some of the omitted assessments are subject to a requirement that the defendant have the ability to pay, and their omission suggests an implicit finding that defendant here lacked the ability to pay these penalties. Second, this court is not in a position to make factual determinations about the amounts of fees that are dependent on factual findings, or about defendant's ability to pay; this court should therefore decline to make any such factual findings. Third, the prosecutor failed to raise any objection below concerning the omitted penalties and fees, so that this court should not remand the case to the trial court to make such findings. Fourth, the failure to impose a fine or fee that may be excused for inability to pay is not a jurisdictional error. The appellate court should presume, rather, that the trial court found that the defendant lacked the ability to pay. (*People v. Burnett* (2004) 116 Cal.App.4th 257, 261.)

In particular, defendant points out that the amounts of two of the fees—the administration fee (Gov. Code, § 29550.1) and the booking fee (Gov. Code, § 29550.2)—are not specifically fixed by the statute, but vary depending on the particular jurisdiction seeking reimbursement. Any amounts not specified require a judicial determination. In addition, after the amount has been judicially determined, a defendant is entitled to a hearing on his or her ability to pay. None of these procedures have occurred in this case; this court should therefore decline to order these particular fees, which were not ordered by the trial court.

On the record provided, we have no means to determine why the trial court acted as it did. It failed to follow the acceptable shorthand of imposing "penalty assessments," leaving to the clerk the responsibility of entering the appropriate penalties, assessments and surcharges. The court failed to mention the additional assessments at all, although it did expressly impose the operations assessment and criminal conviction fees.

Because the omitted fees are numerous, and subject to some exercise of judicial finding and determination, we conclude that the best course is to remand the matter with directions for the trial court to consider and determine the amounts of any of the omitted mandatory fees to be imposed, as well as to afford defendant a hearing on his ability to pay any of the fees that may be subject to an ability-to-pay requirement.

IV. The Visitation Order Must Be Remanded for Modification

Finally, defendant contends that the trial court erred in imposing a no-visitation order as to the victims who were adults at the time of sentencing. Penal Code section 1202.05 provides that the trial court should enter an order prohibiting visitation between

23

the defendant and the child victim, when the defendant is sentenced to state prison for specified sex crimes. In *People v. Scott* (2012) 203 Cal.App.4th 1303 (*Scott*), however, the court held that the statute was not intended to prohibit visitation as to a victim who, although a child at the time of the offenses, had reached the age of 18 years as of the time of sentencing. (*Id*. at pp. 1312, 1323.) The *Scott* court found no legislative intent to restrict the independent autonomy of adult victims, who should be able to make their own decisions with respect to whether or not to visit the inmate. (*Id*. at pp. 1317-1319.)

The People agree that the no-visitation order should be reversed as to Doe 2, and Doe 1, each of whom had reached majority by the time of the sentencing hearing.

The People also represent, however, that Doe 3, the youngest child, will have reached her 18th birthday in February 2013. Doe 3 was still a minor at the time of defendant's sentencing, and the no-visitation order was therefore valid as to her at the time it was entered. Presumably, however, she has achieved majority by the present time. If she has in fact turned 18, then even as to her, the no-visitation order has reached its natural expiration date. We therefore remand the matter to the trial court with directions to determine whether Penal Code section 1202.05 no longer applies, as to any of the three victims. The trial court shall ensure that the California Department of Corrections and Rehabilitation is notified of the appropriate modifications to or expiration of the visitation restrictions order.

## DISPOSITION

The court was not required to stay the sentences as to any of the lewd and lascivious conduct convictions under Penal Code section 654, and his conviction for

24

possession of child pornography was not time-barred. We agree that the sex offender fees should be reduced in part, to a total of $7,300. Otherwise, the matter is remanded for the trial court to consider the imposition of several possible penalty assessments, and to hold any relevant hearings at defendant's request concerning defendant's ability to pay such assessments, where the assessments are predicated on an ability to pay. The matter is also remanded with directions to determine the continued applicability, if any, of Penal Code section 1202.05, or whether the no-visitation order entered pursuant to that section has terminated by reason of the victims' achievement of adult status. (*Scott*, *supra*, 203 Cal.App.4th 1303.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MCKINSTER_____
J.

We concur:


HOLLENHORST_____
Acting P. J.


MILLER_____
J.