Filed 6/30/15  P. v. Fisch CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>SEAN MICHAEL FISCH,<br><br>　　　　Defendant and Appellant. | C075352<br><br>(Super. Ct. No. 10F0008550) |

Defendant Sean Michael Fisch picked up a 17-year-old hitchhiker and asked her to show him her breasts in exchange for the ride.  When she refused and tried to get out of the moving car, defendant grabbed her hair to prevent her from leaving, punched her in the face, and then pushed her out of the car.  He was convicted by jury of felony false

imprisonment by violence or menace and misdemeanor battery.[1] The trial court sentenced defendant to serve a term of three years in the county jail, with execution of the concluding two years suspended and defendant ordered to mandatory supervision during that two-year period. The trial court also ordered defendant to register as a sex offender pursuant to Penal Code section 290.006[2] and to have no contact with the victim.

On appeal, defendant asserts: (1) the trial court abused its discretion in ordering him to register as a sex offender under section 290.006; and (2) the no contact order must be stricken as unauthorized by law. We shall affirm the judgment. As we explain, the trial court's registration order was not an abuse of discretion. Contrary to defendant's argument on appeal, ample evidence supports the trial court's findings defendant's offenses were committed as a result of sexual compulsion or for purposes of sexual gratification and defendant is likely to commit offenses similar to those listed in section 290 in the future. The trial court's rejection of the conclusion of defendant's expert on the question of his risk of reoffending was not arbitrary. Nor has defendant demonstrated any bias on the part of the trial judge. With respect to the no contact order, we conclude such an order was authorized by law and constitutes a valid condition of defendant's mandatory supervision.

FACTS

During the early morning hours of November 29, 2010, defendant picked up a hitchhiker at a gas station in Redding. He stopped at the station to get gas before his graveyard shift at the Record Searchlight, a newspaper in Redding. That morning, he

---

[1]     The jury acquitted defendant of assault with intent to commit rape, kidnapping with intent to commit rape, simple kidnapping, attempted simple kidnapping, and annoying or molesting a child.

[2]     Undesignated statutory references are to the Penal Code.

was required to deliver newspapers to Burney, a small town east of Redding along Highway 299. The hitchhiker, S., was a 17-year-old girl who was looking for a ride to Marysville. She was in Redding visiting a friend, but her ride returned to Marysville without her the day before. Defendant offered to drive her as far as Chico, which S. accepted. When she got in the car, defendant said he "had to go do something for a friend" and drove to the Record Searchlight, where he picked up a box of newspapers. On the way to the newspaper building, S. asked defendant whether he had a wife and kids. He said that he did, which made S. feel more comfortable. Defendant then asked S. how old she was. S. answered she was 17 years old. After picking up the newspapers, defendant headed south on Interstate Highway 5. However, rather than continue south, in the direction of Chico, defendant got onto Highway 299 heading east towards Burney. S. did not realize they were no longer heading towards Chico until they approached Old Oregon Trail, a road leading to Shasta College on the left of the highway and leading into "the middle of nowhere" on the right of the highway.

Defendant turned right. Before he did so, defendant asked S. what she "was going to do for the ride," which S. interpreted to mean "something sexual." S. became afraid. She told defendant: "I can't pay you for the ride and I don't do things like that." Defendant then asked S. to "show her boobs for the ride." She did not comply. They then continued down Old Oregon Trail in silence until S. pulled out her cell phone to send a text message to a friend. Defendant asked to see the phone. When S. refused, defendant said: "[Y]ou're just going to make this worse on yourself." S. then asked to be let out of the car. At this point, defendant made a u-turn in the middle of the road and started heading back towards the highway. After they drove a short distance, S. opened her door and tried to jump out of the car. Defendant grabbed her by her hooded sweatshirt and pulled her back inside. She immediately tried again. This time, defendant pulled her back by her hair and punched her in the face. When S. "freaked

3

out" and "started hitting him," defendant pushed her out of the car, which by this point was not moving very fast. Defendant drove away. S. ran across the highway to Shasta College.

At the college, S. called 911, but her cell phone died during the call. She then stopped a woman who was pulling into the college and used her cell phone to again call 911. The woman described S. as being "[v]ery upset, crying, trembling, very shaken." A sheriff's deputy arrived a short time later. He also described S. as being "[e]motionally upset, shaken." Eventually, S. was able to provide the deputy with enough information for him to determine at which gas station she and defendant crossed paths. The deputy drove her to the gas station, where she confirmed that was the correct location. From there, the deputy drove her northbound on Interstate Highway 5 until she recognized the exit defendant took to drive to the Record Searchlight building. She then led the deputy to that building and identified it as the place defendant stopped. By this time, S. had calmed down enough to provide the deputy with more details of defendant's conduct. She then led him along the remainder of the route defendant drove before her escape from the car. Later in the morning, after delivering S. into the custody of Child Protective Services, the deputy drove back to the gas station, where he viewed surveillance video confirming S. and defendant were at that location at the same time. S. also positively identified defendant in a photographic lineup.

When defendant was questioned by police two days later, he denied picking up a hitchhiker, denied traveling on Highway 299, and denied Burney was in his delivery district. In a second interview, defendant admitted picking up a girl at the gas station, but said she was already "beat up." When he asked her "what was going on," she "said she got left" at the gas station and asked for money and a ride "somewhere [defendant] never even heard of." Defendant told the girl he did not have money for her, but he would try to take her where she needed to go. As they pulled out of the gas station, the girl

4

revealed her destination "was over an hour away." At this point, defendant told her he was on his way to work and could not take her that far. The girl "started getting very upset," so defendant "pulled over on the side of the road, probably not even two blocks from [the gas station] and she got out." Defendant then drove to work.

At trial, defendant offered a third version of events. The beginning of defendant's story was the same, i.e., he picked up a girl at the gas station, who was already "beat up," and agreed to drive her home until he realized how far she needed to go. However, while the girl got out of defendant's car a short distance from the gas station in his prior account, she stayed in the car in the new version. According to defendant, the girl was "sobbing" and "begging" him "to do anything [he] could to just help her out." Defendant "felt bad" for the girl and offered to drive her to his work, which he said would "buy [her] ten minutes of extra time" to try to find a ride home. The girl agreed. She was texting on her phone the entire drive, which defendant believed to be her trying to secure a ride. At the newspaper building, after defendant went inside for five or ten minutes, the girl asked whether defendant knew where "Oregon Trail" or "Old Oregon" was located. Defendant said he did. He assumed from the question that someone who lived on that road had agreed to take her home, got back in the car, and began driving out there. At no point during the drive did defendant ask the girl what she "was going to do for the ride" or ask her to show him her "boobs." A short distance down Old Oregon Trail, defendant became "suspicious" and asked the girl to provide an address. When she indicated "her phone wasn't working," defendant pulled over and asked to see the phone. He was concerned the girl was "trying to set [him] up." When she did not give him the phone, defendant made a u-turn and again asked to see the phone. The girl again did not comply. At this point, defendant said: "That's it. I'm done. . . . You need to get ahold of your parents or you're just going to keep making it worse on yourself." He then

continued up Old Oregon Trail and dropped her off a short distance from a gas station located near Highway 299.

The jury did not believe defendant's account of events, finding him guilty of felony false imprisonment by violence or menace and misdemeanor battery. However, as mentioned, the jury acquitted him of assault with intent to commit rape, kidnapping with intent to commit rape, simple kidnapping, attempted simple kidnapping, and annoying or molesting a child.

## DISCUSSION

## I

### *Sex Offender Registration Order*

Defendant claims the trial court abused its discretion in ordering him to register as a sex offender under section 290.006. Specifically, he argues: (1) there is no evidence to support the trial court's finding he is likely to reoffend by commission of an offense similar to those listed in section 290; (2) the trial court arbitrarily rejected testimony from defendant's expert that he presented a minimal risk of reoffending; and (3) the trial court's decision to require registration resulted from bias harbored against him by the trial judge. We disagree.

### A.

### *Additional Background*

Following the jury's verdict, the People moved for an order requiring defendant to register as a sex offender under section 290.006. At the hearing on the motion, the People submitted evidence defendant had previously exposed himself to a woman and her 10-year-old nephew while masturbating. The event occurred in 2009. The woman testified she was driving down a highway with her nephew in the truck when defendant's car approached from behind and pulled alongside them. Erratic movements of defendant's car caught her attention. When she looked over, defendant was naked from

6

the waist down and was masturbating as he looked at her. The woman yelled at her nephew to not look in defendant's direction. Defendant maintained his position next to the woman's truck, despite the fact she altered her speed, and he continued to masturbate as he did so. This went on for about two miles before the woman called 911 and pulled off the highway to wait for police. She provided the responding officer with defendant's license plate number and positively identified him in a subsequent in-field show up. No charges were filed based on this incident.

Defendant called a forensic psychologist, Dr. Baljit Atwal, who evaluated him and submitted a psychological report recommending defendant not be required to register as a sex offender. We do not provide a detailed summary of the results of the various psychological tests performed. The following will suffice. The Psychopathic Personality Inventory-Revised (PPI-R) revealed defendant, "when he is in conflict with other people, does not register much empathy in the heat of the moment." However, other "low psychopathy scores" indicated defendant "is not prone to engaging in criminal behavior." The Inventory of Offender Risk, Needs and Strengths (IORNS) revealed an "overall risk assessment score," i.e., "the risk associated with criminal and/or violent behavior," of "average." The report notes one factor indicating an increased risk of such behavior is defendant's "problems with interpersonal conflict . . . associated with low self-esteem, poor self-confidence, and difficulty with interpersonal relationships." The report also notes defendant "tends **not** to think before he acts, is slow to learn from previous behaviors, and does not manage strong emotions effectively," which also increase his level of risk. Balancing against these risk factors is defendant's "extremely high" score on the protective scale for environmental resources, i.e., his "unusually strong social support network."

The Sexual Adjustment Inventory (SAI), assessing "risk of sexually offensive behavior," also revealed an elevated score for "impulsiveness, . . . that he tends to act

7

without thinking." This test further revealed defendant exhibited "some defensiveness and some denial . . . in answering items that had some obvious sexual content." While Dr. Atwal expected "a certain degree of defensiveness" due to the fact the evaluation was undertaken in connection with a criminal proceeding, defendant scored in the "75th percentile," which "raised some red flags" in the doctor's mind. Nevertheless, defendant's scores on other components of the test caused the doctor to conclude defendant to be at "low risk for committing sexual assault and specifically rape."

We also note Dr. Atwal was aware of the 2009 incident, but "didn't factor it in one way or the other" because defendant was not charged with or convicted of the offense and the police report contained "inconsistent information," i.e., the victim's account of defendant masturbating was purportedly inconsistent with there being no evidence of ejaculation. However, the doctor did acknowledge if the 2009 incident in fact occurred, "then it would have increased his risk" for reoffending. Overall, the doctor concluded defendant should not be ordered on the sex offender registry and instead recommended outpatient counseling to deal with "his tendency to be impulsive, his tendency to perhaps rub people the wrong way, . . . and [his] interpersonal problems."

After hearing argument on the motion, the trial court ordered defendant to register as a sex offender under section 290.006, finding (1) "defendant committed the offenses for which he was convicted, the false imprisonment by violence and the battery, [as] a direct result of sexual compulsion and/or for purposes of sexual gratification," and (2) "lifetime sex registration . . . is necessary to protect the public and, more importantly, enable law enforcement to quickly locate possible suspects who commit serious behavior as that exhibited by the defendant in this case in the future."

With respect to the first of these findings, the trial court relied exclusively on the facts of this case, noting: "The defendant asked the victim what she was going to do for the ride, and I emphasize 'do.' That information suggests that the defendant was

8

referring to a sexual act which is how the victim interpreted the statement. I see no other logical or rational conclusion and I haven't heard any other than that he made the statement due to a sexual compulsion or for sexual gratification. [¶] The victim testified that the defendant made reference to her boobs, her breasts, and she also told [a detective] that the defendant asked to see her boobs and asked her about her sexual history. This also tends to support a sexual motive on the defendant's part."

With respect to the appropriateness of requiring lifetime registration, the trial court relied primarily on the facts of this case, bolstered by the fact defendant had previously exposed himself to a woman while masturbating. Addressing this prior incident, the trial court found the testimony of the alleged victim to be "extremely credible," noted that "past behavior is reflective of future conduct," and concluded: "[T]he conduct of the defendant [in] that . . . situation is consistent with my view of his behavior in this case and supports, I believe, my findings and conclusions regarding the appropriateness of registering pursuant to . . . Section 290." Addressing Dr. Atwal's testimony, the trial court stated: "I don't really question her testimony except that I question the conclusion that the defendant's at a minimal risk for reoffense. The fact that defendant lacks empathy and has low self-esteem and self-confidence and difficulty with interpersonal relationships as well as his defensiveness in answering items or questions with obvious sexual content is indicative of an inability to control his behavior which in my opinion increases the risk of reoffense of sexual or violent conduct in the future[]."

**B.**

*Analysis*

The Sex Offender Registration Act (the Act) requires mandatory lifetime sex offender registration for any person convicted of an offense listed in section 290, subdivision (c). (§ 290, subd. (b).) These enumerated offenses "may be characterized generally as sexual offenses committed by means of force or violence, violent offenses

9

committed for sexual purposes, sexual offenses committed against minors, or offenses that involve the sexual exploitation of minors." (*Lewis v. Superior Court* (2008) 169 Cal.App.4th 70, 78 (*Lewis*).) The premise behind sex offender registration is that "sex offenders pose a 'continuing threat to society'. . . ." (*Wright v. Superior Court* (1997) 15 Cal.4th 521, 527.) Thus, one reason for requiring sex offender registration is to enable law enforcement "to keep track of persons likely to reoffend" by commission of "offenses like those listed in section 290." (*Lewis*, *supra*, 169 Cal.App.4th at p. 78.) Another reason for requiring such registration is "to notify members of the public of the existence and location of sex offenders so they can take protective measures." (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1196 (*Hofsheier*), overruled on other grounds in *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 888.)

Section 290.006 gives the trial court discretion to require sex offender registration for persons convicted of an offense not listed in section 290, subdivision (c): "Any person ordered by any court to register pursuant to the Act for any offense not included specifically in subdivision (c) of Section 290, shall so register, if the court finds at the time of conviction or sentencing that the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification. The court shall state on the record the reasons for its findings and the reasons for requiring registration." When imposing a discretionary registration requirement under this provision, "the trial court must engage in a two-step process: (1) it must find whether the offense was committed as a result of sexual compulsion or for purposes of sexual gratification, and state the reasons for these findings; and (2) it must state the reasons for requiring lifetime registration as a sex offender. By requiring a separate statement of reasons for requiring registration even if the trial court finds the offense was committed as a result of sexual compulsion or for purposes of sexual gratification, the statute gives the trial court

10

discretion to weigh the reasons for and against registration in each particular case." (*Hofsheier*, *supra*, 37 Cal.4th at p. 1197.)

Defendant does not challenge the trial court's finding that his crimes were committed as a result of sexual compulsion or for purposes of sexual gratification.[3] Rather, defendant complains the trial court abused its discretion in ordering him to register as a sex offender for life because there was insufficient evidence he would be likely to reoffend by commission of an offense similar to those listed in section 290, subdivision (c). He is mistaken.

In exercising its discretion under the second stage of the *Hofsheier* analysis, the trial court should "consider all relevant information available to it at the time it makes its decision." (*People v. Garcia* (2008) 161 Cal.App.4th 475, 483, disapproved on other grounds by *Johnson v. Department of Justice*, *supra*, 60 Cal.4th at p. 888.) The facts supporting registration need be proved only by a preponderance of the evidence. (*People*

---

[3] The following paragraph in defendant's opening brief is buried in the middle of his argument that he presents a low risk of reoffending: "The only offense of which [defendant] was convicted -- forcible false imprisonment and misdemeanor battery -- are not sex offenses. Although [defendant's] comments to [S.] may have sexual overtones, asking what she would do for the ride is certainly equivocal. And, asking to see her boobs is not indicative of or a precursor to the commission of a violent sexual offense and does not show a likelihood of reoffense. Further, these statements were uttered before commission of the false imprisonment and battery offenses and there is no direct evidence that these offenses were committed with a sexual intent or for a sexual purpose." To the extent this could be construed as an argument challenging the trial court's finding under the first stage of the *Hofsheier* analysis (*Hofsheier, supra,* 37 Cal.4th at p. 1197), it is forfeited for failure to (1) raise it under a separate heading, (2) provide meaningful argument supported by citation to authority, and (3) provide citations to the record. (See Cal. Rules of Court, rule 8.204(a)(1)(B)&(C).) In any event, we conclude there is sufficient evidence in the record to support the trial court's conclusion defendant's offenses were committed as a result of sexual compulsion or for purposes of sexual gratification.

*v. Marchand* (2002) 98 Cal.App.4th 1056, 1063-1065.) Here, the trial court based its decision to require registration on the facts of this case coupled with the fact defendant had previously exposed himself to a woman and her 10 year-old nephew while masturbating. Beginning with this case, while the jury acquitted defendant of the more serious sex offenses, the trial court was within its discretion in determining, by a preponderance of the evidence presented at trial, that defendant was nevertheless guilty of serious sexual misconduct with a minor. Nor can there be any dispute this misconduct was violent in nature, as the jury found defendant guilty of false imprisonment *by violence or menace* and *battery*. Thus, while not enumerated in section 290, subdivision (c), defendant's crimes in this case were similar to such enumerated crimes. (See *Lewis*, *supra*, 169 Cal.App.4th at p. 78 [enumerated crimes generally include "violent offenses committed for sexual purposes" and "sexual offenses committed against minors"].) Turning to defendant's previous sexual misconduct, the testimony of the prior victim was sufficient to establish by a preponderance of the evidence this misconduct occurred. As to the trial court's ultimate conclusion defendant would be likely to reoffend by committing similar crimes in the future, we note that when an historical pattern of conduct is shown, it is not unreasonable to infer that conduct will repeat itself in the future. (See *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1157; *id.* at pp. 1163-1164 ["Notwithstanding the nuances of psychiatric diagnosis and the difficulties inherent in predicting human behavior, the United States Supreme Court has consistently upheld commitment schemes authorizing the use of prior dangerous behavior to establish both mental impairment and the likelihood of future harm"].)

Nevertheless, defendant argues it was improper for the trial court to reject the conclusion of his expert, i.e., he presented a low risk of reoffending. We disagree. "A trial court is not required to accept even unanimous expert opinion at face value. [Citation.] As long as the decision to reject such testimony is not 'arbitrary,' the trial

12

court may reject the conclusion of an expert." (*In re Marriage of Battenburg* (1994) 28 Cal.App.4th 1338, 1345.) Here, the trial court rejected Dr. Atwal's conclusion as to defendant's risk of reoffending, noting her evaluation of him revealed he "lacks empathy," has low "self-esteem and self-confidence and difficulty with interpersonal relationships," and exhibited "defensiveness in answering items or questions with obvious sexual content." The trial court found these facts indicated defendant has "an inability to control his behavior" and concluded there was enough risk he would reoffend to require registration. Far from being arbitrary, we conclude the trial court's assessment was quite reasonable. Indeed, defendant's inability to control his behavior is confirmed by the fact he committed the present offenses not more than two years after escaping prosecution for the prior sexual offense, which defendant's own expert acknowledged "would have increased his risk" for reoffending had she not disregarded the prior offense in her analysis.

Finally, defendant argues the trial court's decision to require registration resulted from bias harbored against him by the trial judge, the Honorable Gregory S. Gaul. Defendant supports this contention by noting Judge Gaul revoked his status of being released on his own recognizance (OR) and set bail at $1 million immediately following his testimony at trial. As Judge Gaul explained his decision in response to a disqualification motion, considering the nature of the allegations, the fact defendant was out of custody during trial was "of great concern, . . . but his release on [OR] had previously been ordered by another judge and [Judge Gaul] had no independent objective basis to revisit that earlier determination" until he heard the evidence in the case. Judge Gaul then described his view of the evidence, noting the victim "presented as very credible," her testimony was corroborated by various items of independent evidence, defendant's various versions of what had happened contradicted each other, and his trial testimony was internally inconsistent. He then explained his rationale for revoking

13

defendant's OR status: "The charged offenses involved serious acts of violence on a minor female with evidence of sexual intent as the motivating factor for that violence; [¶] That public safety is the primary consideration in setting bail and that ordinarily an individual facing such serious charges would not be free of custody; [¶] That in my view the defendant's testimony did not go well for the defense and there was a strong likelihood that the defendant might flee prior to completion of the trial; [¶] The defendant's version of events was not credible in light of the testimony and strong corroborating evidence of guilt presented by the prosecution prior to the presentation of the defendant's testimony; [¶] The defendant's demeanor while testifying. Specifically, a portion of his testimony during which he briefly, but forcefully, expressed his anger/frustration with the victim (in reference to a point during the incident when he says the victim was begging him to drive her to the City of Chico, located two counties south of Shasta County). Of all the factors I considered, I recall that as the defendant provided this testimony, I distinctly felt as if I was witnessing the defendant's anger and frustration just as the victim likely experienced it while trying to escape from the defendant; [¶] After becoming more fully aware of the facts, the bulk of which I was not privy to until I heard the evidence as the jury was hearing it, in my mind there was a change of circumstances warranting my reassessment of the defendant's custodial status."

Judge Gaul's decision to revoke defendant's OR status does not reveal any bias harbored against defendant, as the judge who ruled on the disqualification motion found. As the disqualification ruling observes, Judge Gaul "ensured the jury was not made aware of the change in custody status" and "he lowered bail after the defendant was found guilty of lesser charges . . . ." These facts run counter to defendant's assertion Judge Gaul harbored a bias against him.

14

Defendant also takes issue with certain statements Judge Gaul made while explaining his decision to require defendant to register as a sex offender. Specifically, defendant complains Judge Gaul "ruled as if [he] had been convicted as charged," when the jury acquitted him on the more serious crimes. Not so. Judge Gaul correctly observed that "a not guilty verdict by a jury does not mean that the defendant is innocent," and pointed out various reasons he believed the jury could have found defendant not guilty of the more serious offenses without necessarily finding defendant was innocent of the misconduct. Then, based on his assessment of the evidence, Judge Gaul determined by a preponderance of the evidence the offenses for which defendant was convicted were committed as a result of sexual compulsion or for purposes of sexual gratification and lifetime registration as a sex offender was appropriate. This is the type of analysis Judge Gaul was required to employ in exercising his discretion under section 290.006.

The trial court did not abuse its discretion in ordering defendant to register as a sex offender under section 290.006.

## II

### *No Contact Order*

We also reject defendant's assertion the no contact order must be stricken as unauthorized by law.

As a condition of defendant's being ordered to mandatory supervision, the trial court ordered him "to neither attempt nor have any contact in any manner with nor be in the presence of the victim." Defendant does not dispute such an order would be appropriate if he were granted probation rather than mandatory supervision. (See § 1203.1, subd. (i)(2) [no contact order authorized as condition of probation where defendant convicted of sex offense subjecting him or her to sex offender registration]; see also *id*., subd. (j) [trial court may impose other reasonable conditions of probation];

15

*People v. Lent* (1975) 15 Cal.3d 481, 486 [condition of probation that requires or forbids conduct is valid if reasonably related to crime of which defendant was convicted or future criminality].)

Instead, citing our decision in *People v. Fandinola* (2013) 221 Cal.App.4th 1415 (*Fandinola*), defendant argues the foregoing provisions do not authorize the no contact order in this case because he was ordered to mandatory supervision rather than granted probation. Defendant's reliance on *Fandinola* is misplaced. There, we held section 1203.1b did not authorize imposition of a probation supervision fee because that provision, by its terms, applied to cases "'in which a defendant is granted probation or given a conditional sentence'" and mandatory supervision "is not a grant of probation or a conditional sentence." (*Id*. at p. 1422.) However, as we also explained in *Fandinola*, while probation and mandatory supervision are not interchangeable, section 1170, subdivision (h)(5)(B)(i), provides a defendant ordered to mandatory supervision "'shall be supervised by the county probation officer *in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation*.'" (*Fandinola*, *supra*, 221 Cal.App.4th at p. 1422, italics added.) In a case such as this one, a no contact order is a condition generally applicable to persons granted probation. Moreover, while we also noted in *Fandinola* that "mandatory supervision is more similar to parole than probation" (*id*. at p. 1423), "[t]he validity and reasonableness of parole conditions is analyzed under the same standard as that developed for probation conditions," i.e., "'a condition of [parole] which requires or forbids conduct which is not itself criminal is valid if that conduct is reasonably related to the crime of which the defendant was convicted or to future criminality.'" (*People v. Martinez* (2014) 226 Cal.App.4th 759, 764, quoting *People v. Lent*, *supra*, 15 Cal.3d at p. 486.) Here, the no contact order was reasonably related to defendant's crimes and to future criminality.

In the alternative, defendant asserts the condition "is overbroad in that it requires [defendant] not to ever be in the presence of the victim. First, 'presence,' as used in the order, is not defined. Second, 'presence' is a broad term and can be construed to mean within inches, within feet, within yards, in the same shopping mall, in the same movie theater, etc. Third, whatever 'presence' may mean, [defendant] can unintentionally violate the order merely entering a grocery store where the victim is shopping." "A probation condition 'must be sufficiently precise for the probationer to know what is required of him [or her], and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness. [Citation.] A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad. [Citation.]" (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.) We review such a challenge de novo (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143) and interpret the challenged condition with "common sense." (*In re Ramon M.* (2009) 178 Cal.App.4th 665, 677; *People v. Olguin* (2008) 45 Cal.4th 375, 383 ["probation condition should be given 'the meaning that would appear to a reasonable, objective reader'"].) We conclude a reasonable person would understand being in one's "presence" to mean being in "the part of space within one's immediate vicinity." (Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 982, col. 1.) So understood, the term is neither vague nor overbroad.

Finally, for reasons expressed in *People v. Patel* (2011) 196 Cal.App.4th 956, we decline to entertain defendant's argument that the condition must be modified to include a knowledge requirement. (*Id.* at pp. 960-961.)

We conclude the no contact order imposed in this case was authorized by law and constitutes a valid condition of defendant's mandatory supervision.

DISPOSITION

The judgment is affirmed.


                                                  _____HOCH_____, J.


We concur:


_____HULL_____, Acting P. J.


_____MURRAY\_\_\_, J.